CADY, Chief Justice,
In this appeal, we must decide if article I, section 17 of the Iowa Constitution categorically prohibits any minimum term of incarceration without the possibility of parole when imposed on an individual who was a juvenile at the time of the offense. If it does not, we must also decide whether the district court erred in resentencing Christopher Roby to a minimum term of incarceration following a hearing in which the court was to consider certain mitigating factors attributable to his youth at the time of the offense. In December of 2004, a jury found Roby guilty of two counts of sexual abuse for his conduct when he was sixteen and seventeen years of age. The court initially sentenced him, as required by statute, to twenty-five years with a mandatory minimum of seventeen and one-half years for sexual abuse in the second degree and a concurrent term of ten years for sexual abuse in the third degree. Following our decision in State v. Lyle, 854 N.W.2d 378 (2014), in which we held all statutorily imposed mandatory mínimums constituted cruel and unusual punishment under the Iowa Constitution, the district court held a resentencing hearing to determine whether the minimum term of incarceration should be imposed. It found it should and issued an order detailing its reasoning. Roby appealed,, arguing any minimum term of incarceration without the possibility of parole is unconstitutional and, in the alternative, that the district court failed to properly apply the factors we identified in Lyle. The court of appeals disagreed with Roby on both matters and affirmed .the sentence. We granted further review. On further review, we find the Iowa Constitution does not prohibit a district court from sentencing a juvenile offender to a minimum term of incarceration without the possibility of parole, but we remand for resentencing.
I. Factual Background and Proceedings.
Christopher Roby was convicted following a jury trial of the crimes of sexual *133 abuse in the second and third degrees on December 2, 2004. He was sixteen and seventeen when he committed the crimes. The conviction resulted from Roby’s inappropriate sexual conduct with S.M., who was ages eleven through thirteen during the relevant times.
A. The Offenses. The first incident, for which Roby was not prosecuted, but the jury did hear evidence on, was apparently in the spring of 1998. Roby was staying at S.M.’s house. S.M.’s parents were downstairs, while S.M. and her siblings, along with Roby, were upstairs. This was not unusual. Roby was S.M.’s brother’s best friend since kindergarten and would often stay overnight. He was considered a member of the family and would even accompany them on vacations and to church. S.M., then ten years old, fell asleep in her parents’ bedroom while watching television. She awoke to Roby, then fifteen, forcing his hand under her pants and underwear. She immediately left the room, went downstairs, and told her parents what had occurred. S.M.’s parents were furious and confronted Roby, who left the house with S.M.’s brother, and the two walked to a gas station before Roby went home to his own parents. S.M.’s parents did not contact the police or Roby’s parents at that time.
After about six to eight weeks, S.M.’s parents allowed Roby back into the home. They insisted Roby not be left alone with S.M. Over time, however, this precaution eased. Years passed with Roby frequently coming and going and staying over, just as he was before the initial incident. In March of 2002, Roby, now eighteen, left for the Navy. In September of -2002, he returned on leave. That was when S.M., now fourteen, confided in her brother’s girlfriend that Roby had been abusing her ever since being let back into the house. S.M. stated the abuse would occur nearly every time Roby had stayed over during the preceding three years and that it occurred again with Roby back on leave. Either Roby would touch S.M.’s genitals and breasts or he would force S.M. to masturbate him. This contact with S.M. was always nonconsensual and was severely impacting her mental health. S.M.’s parents learned of the abuse, and S;M.’s mother confronted Roby. Roby denied any contact occurred. S.M.’s mother then went to the police.
The police arrested Roby. There is some indication Roby initially thought the police were investigating him for stealing a video game or maybe thought admitting that crime would deflect them from investigating the abuse. During an interrogation, Roby confessed to the contact. However, the court ultimately suppressed the interrogation because Roby only confessed after the investigator implied he must submit to a polygraph for use in court, promised him leniency, and threatened greater punishment if he continued to deny the allegations.
After the interrogation, Roby was charged and released on bond to. return to the Navy. He served for two years until being discharged to answer for this ease. The prosecutor had initially charged Roby with one count of sexual abuse in the third degree for the alleged conduct while Roby was eighteen and S.M. was under fourteen. After a breakdown in plea negotiations, the prosecutor charged Roby with four counts, delineated by Roby and S.M.’s birthdays: (Count I) sexual abuse in the second degree for conduct occurring when S.M. was under twelve and Roby was fifteen or sixteen, (Count II) sexual abuse in the third degree for conduct occurring when S.M. was under fourteen and Roby was under eighteen, (Count III) sexual abuse in the third degree for conduct occurring when S.M. was under fourteen and *134 Roby was eighteen, and (Count IV) sexual abuse in the third degree for conduct occurring when S.M. was fourteen and Roby was eighteen. After Roby moved to dismiss Count I for alleging conduct while Roby was fifteen and therefore under the jurisdiction of the juvenile court, the prosecutor amended Count I a second time and confined it to the time after Roby turned sixteen. Thus, while the jury heard evidence regarding the initial incident when S.M. told her parents Roby was touching her while she was sleeping, he was not charged for this event. Instead, he was charged based on S.M.’s statements of continuing abuse from that point.
At trial, the State presented testimony from S.M., her parents, and her brother. Roby did not testify. He also did not present witnesses. The jury found Roby guilty of Counts I and II. They found him guilty of sexual abuse occurring when Roby was sixteen and S.M. was eleven, and when Roby was seventeen and S.M. was twelve or thirteen years old. The jury found Roby not guilty of Counts III and IV, abuse occurring after he turned eighteen.
B. Initial Sentencing. A presentence investigation (PSI) report was prepared, and the court held a sentencing hearing with testimony from Roby and his parents. Though the record is limited on Roby’s life before prison, at least some history appears from trial testimony, this hearing, and the PSI. The record shows Roby was born two months premature on December 20, 1988. His mother indicated his biological father abducted, abused, and neglected him for four years when he was very young. Roby’s father eventually returned him to his mother in Waterloo, who later married a man who adopted Roby. Roby’s mother was a homemaker and his adoptive father worked for a farm implement company as a designer. Roby is the middle child of three. He maintained a good relationship with his family, despite the absence of his biological father, but generally felt his childhood was “rough.” He was diagnosed with attention-deficit disorder. He completed the tenth grade at Expo Alternative Learning Center in Waterloo and reported getting along well with his teachers, although he was suspended once for fighting. Roby joined the Navy to, in his words, straighten out his life. The PSI reported Roby frequently consumed alcohol while in the Navy and used marijuana. At sentencing, Roby denied any alcohol or drug use. Roby had no juvenile record before this case.
Roby’s mother testified,
It just seems like it’s been one thing after another with this kid.... This kid has tried and tried and tried to get his life on track, and it seems like every time he does, it’s one thing after another waitin’ there to knock him back down. And now you’re going to take him away from me for 25 years or whatever, and I just—I think it’s ridiculous.
Roby’s adoptive father testified,
I think the penalty for the crime far outweighs the crime. It’s absurd and it’s even more absurd that the judge is not allowed to make any adjustments to that. I don’t think you can take things like that away from the judges. Second-degree sexual abuse, you can’t lump all of them into one. Chris was a minor when it happened. And like what he did get a little therapy, you don’t put them in jail for 25 years. That’s not going to solve anything.
Roby also testified. He maintained his innocence and stated, “There’s just so many inconsistencies in her story, and I mean, I just—I don’t see how one person can—can take another person’s life like this.”
*135 The court sentenced Roby, stating, “The court is sympathetic to the feelings of the family, however, as they point out, this is the only disposition available to the court under the law[] as it presently stands.” The court was statutorily required to, and did, impose the maximum sentence of twenty-five years on Count I with a mandatory minimum of seventeen and one-half years before eligibility for parole. The court imposed a concurrent sentence of ten years for Count II. This was in January of 2005. Roby had recently turned twenty-one while in jail awaiting sentencing.
C. Resentencing. In 2014, following this court’s holdings in State v. Null, 836 N.W.2d 41 (Iowa 2013), State v. Pearson, 836 N.W.2d 88 (Iowa 2013), and State v. Ragland, 836 N.W.2d 107 (Iowa 2013), Roby, who was thirty years old, moved to correct an illegal sentence. He argued he was entitled to an individualized review under the principles of those cases. Around the same time, we issued our opinion in Lyle and confirmed juveniles like Roby were entitled to individualized review of their statutorily imposed sentences. 854 N.W.2d at 404. Pursuant to these opinions, the court held a resentenc-ing hearing to correct the statutorily mandated minimum sentence of seventeen and one-half years using the five factors identified in Lyle:
(1) the age of the .offender and the features of youthful behavior, such as “immaturity, impetuosity, and failure to appreciate risks and consequences”; (2) the particular “family and home environment” that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.
Id. at 404 n.10 (quoting Miller v. Alabama, 567 U.S. 460, 477-78, 132 S.Ct. 2455, 2468, 183 L.Ed.2d 407 (2012)). On “considering all the relevant factors and facts of the case,” the district court had to either “re-sentence [Roby] by imposing a condition that [Roby] be eligible for parole” or, “[i]f the mandatory minimum period of incarceration is warranted, ... impose the sentence provided for under the statute, as previously imposed.” Id.
Roby presented his prison disciplinary and other prison treatment records. This was the only exhibit. Roby’s counsel addressed the Lyle factors by first noting Roby was kieked out of his parents’ home, indicating a lack of familial support. Roby’s counsel continued, noting Roby had no pri- or criminal record. She argued Roby had difficulties navigating the criminal justice system as indicated by the interrogation the court ultimately had to suppress. She noted he served two years in the Navy. She argued he had the potential to be rehabilitated based on his prison disciplinary records, which showed most of his violations occurred early on in his incarceration. She also noted he had obtained his GED, taken a college course, been a lead person in the science shop, worked in the kitchen, and tutored other inmates. Finally, Roby’s counsel pointed out that Roby had family in Waterloo willing to assist him on release.
The State countered that Roby’s disciplinary records did not indicate rehabilitation potential because they included an infraction for inappropriately touching female staff. The State also pointed to Roby’s failure to obtain sex-offender treatment, which Roby’s counsel argued was due to department of corrections backlog and policy not to treat offenders until they are nearing release. The State also argued Roby continued to deny responsibility and *136 blame the victim based on statements he made while being treated for anxiety and sleeplessness. The State concluded as to the first Lyle factor, “It would cut against him because of the multiple acts that were involved in this case.” The State continued its arguments on the Lyle factors, noting Roby’s home environment was the same as the victim’s. As to the circumstances of the crime, the State noted Roby’s actions were not sexual exploration, but abuse. As to navigating the criminal process, the State noted Roby had to be taken from the Navy and that he exercised his rights to have the interrogation suppressed. As to rehabilitation, the State again argued Roby failed to take responsibility, as shown by his numerous posttrial appeals and motions.
Roby testified on his own behalf, stating,
Your Honor, over the last ten years, I’ve tried to better myself while I was in there. I was told when I was getting my GED, one of the teachers told me that if you fail to plan, you plan to fail. So everything I’ve done since I’ve been in there has been to make it so I’ll be a better person when I get out, Your Hon- or. I’ve gotten my GED. I’ve taken any courses that’s been available to me. I’ve learned job skills. I’ve learned trades. I’ve helped other people bettering themselves, teaching them how to do a cover letter, a resume, how to use a computer.
I’m sorry for all of this, Your Honor. I just—I hope that after ten years I can get my life back.
Approximately a month later, the court issued its ruling.
As to the first Lyle factor, the court found,
The acts that resulted in the jury’s guilty verdicts were not merely based on the defendant’s immaturity, impetuosity and failure to appreciate the risks and consequences. In this case this defendant had been confronted at an earlier time about improper touching of this victim. Notwithstanding that, the defendant continued to sexually abuse his victim.
As to the second factor,
While the defendant’s family and home environment were obviously not the best, the victim’s family attempted to step in and provide a home for him. It was during this time that the defendant took advantage of the child victim.
For the third,
The defendant’s participation in the conduct that resulted in his conviction was not the result of any familial or peer pressure. It was conduct freely chosen by the defendant with no care at all for the victim and less care for the victim’s family that was giving him a home.
The court did not address the fourth factor, but noted as to the fifth,
While the court may have been hopeful that a period of incarceration would have led the defendant to some remorse for his behavior, it is apparent that this is not the case. The documents submitted as Defendant’s exhibit 1 show that in an evaluation conducted in May of 2005 at the Iowa Medication and Classification Center the defendant again denied any sexual contact ever occurring with the victim. In a note entitled “Psychological Encounter” showing an encounter date of October 12, 2012, while explaining his sleep problems, it was reported, “He noted that he does not understand how his case has not been overturned because he was not in Iowa at the time of the crime.”
The victim stance taken by the defendant does not bode well for rehabilitation. After 10 years the defendant has yet to confront his own behavior or even *137 begin to be able to empathize with the victim of his acts.
Thus, the court found a mandatory minimum sentence was appropriate. Roby appealed, and the court of appeals affirmed. We granted further review to address Roby’s two arguments: (1) that' the Iowa Constitution categorically prohibits all minimum terms of incarceration without the possibility of parole when imposed on juveniles, and in the alternative, (2) that the district court erred in its analysis of the Lyle factors. ■
II. Standard of Review.
We review a constitutional challenge to a sentence de novo. See State v. Sweet, 879 N.W.2d 811, 816 (Iowa 2016). Roby’s first argument is a categorical one, and therefore, we apply de novo review. See, e.g., id. at 816-17; see also Lyle, 854 N.W.2d at 382-83. However, the parties dispute the appropriate standard of review on Roby’s second challenge, and we have not yet established the standard of review for appeals following a juvenile’s resen-tencing hearing.
As we recently noted in State v. Seats, “We have expressed three different standards of review when a defendant challenges his or her sentence on appeal.” 865 N.W.2d 545, 552 (Iowa 2015). We review for an “abuse of discretion,” our most deferential standard, “if the sentence is within the statutory limits.” Id. We review for “correction of errors at law,” an intermediate standard, “when the defendant challenges the legality of a sentence on nonconstitutional grounds.” Id. at 553. Finally, we apply de novo review, our least deferential standard, to constitutional challenges. Id.
Roby reasons the individualized hearing requirement is constitutional in origin, and therefore, an appeal from such a hearing is on constitutional grounds subject to de novo review. The State argues the sentence imposed is within the statutory limits, and therefore, our-.review is for an abuse of discretion. The court of appeals in this case reviewed Roby’s resentencing hearing for ah abuse of ■ discretion. We affirm this approach, but would elaborate on the use of the abuse-of-discretion standard in the juvenile sentencing context.
 We begin by noting an unconstitutional sentence remains unconstitutional even if the. district court held a hearing before imposing • it: See Montgomery v. Louisiana, 577 U.S. -, -, 136 S.Ct. 718, 734, 193 L.Ed.2d 599 (2016) (“Even if a court considers a child’s age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects ‘unfortunate yet transient immaturity.’ ” (quoting Miller, 567 U.S. at 478-80, 132 S.Ct. at 2469)). However, we have.not yet categorically declared all minimum sentences of incarceration unconstitutional when imposed.on juvenile offenders. See Lyle, 854 N.W.2d at 403 (“[T]he holding in this case does not prohibit judges from sentencing juveniles to prison ■ for the length of time identified by the legislature for. the crime committed..., ”). Instead, we have held it is the “absence of a sentencing procedure” that offends article I, section 17 of the Iowa Constitution. Id. at 402. Thus, when there is an appropriate sentencing procedure there is no constitutional violation. Under our existing law, if the district court follows the sentencing procedure we have identified and a statute authorizes the sentence ultimately imposed, then our review is for abuse of discretion; we ask whethér there is “evidence [that] supports the sentence.” Seats, 865 N.W.2d at 553.
However, we agree with a recent decision from a Michigan appellate court *138 that “the abuse-of-discretion standard requires further explanation in this context.” See People v. Hyatt, 316 Mich.App. 368, 891 N.W.2d 549, 576 (2016). Although the Michigan court was reviewing the imposition of a sentence of life without parole, we find the special considerations involved in sentencing a juvenile offender to an adult sentence similarly mean that, “even under this deferential standard, an appellate court should view such a sentence as inherently suspect,” and “cannot merely rubber-stamp the trial court’s sentencing decision.” Id. at 577-78. We too import this guidance from the Eighth Circuit:
A discretionary sentencing ruling, similarly, may be [an abuse of discretion] if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.
Id. at 578 (alteration in original) (quoting United States v. Haack, 403 F.3d 997, 1004 (8th Cir. 2005)). In sum, while the review is for abuse of discretion, it is not forgiving of a deficiency in the constitutional right to a reasoned sentencing decision based on a proper hearing.
III. The Categorical Challenge.
Like the United States Supreme Court, we address a categorical constitutional challenge to a sentencing practice by using a two-step analysis. See Graham v. Florida, 560 U.S. 48, 61, 130 S.Ct. 2011, 2022, 176 L.Ed.2d 825 (2010); Roper v. Simmons, 543 U.S. 551, 564, 125 S.Ct. 1183, 1192, 161 L.Ed.2d 1 (2005); Sweet, 879 N.W.2d at 835; Lyle, 854 N.W.2d at 386. Under this analysis, we first “look to whether there is a consensus, or at least an emerging consensus,” to guide our consideration of the question. Sweet, 879 N.W.2d at 835. “Second, we exercise our independent judgment” to decide the question. Id. In this case, the question is whether a twenty-five-year sentence with a minimum period of incarceration of seventeen and one-half years for a juvenile offender convicted of sexual abuse is categorically prohibited under the cruel and unusual punishment clause of the Iowa Constitution. In other words, the question is whether our constitution requires all juvenile offenders be immediately eligible for parole.
A. Evidence of Consensus. We recognize the presence or absence of a national consensus is normally indicated by the actions of legislatures. See, e.g., Graham, 560 U.S. at 61, 130 S.Ct. at 2022 (“The Court first considers ‘objective indi-cia of society’s standards, as expressed in legislative enactments and state practice,’ to determine whether there is a national consensus against the sentencing practice at issue.” (quoting Roper, 543 U.S. at 563, 125 S.Ct. at 1191)).
■ When we decided Lyle, we noted some states had already “limited or abolished mandatory mínimums for juveniles.” 854 N.W.2d at 386 n.3 (compiling statutes). Since then, state legislatures have continued to reform their state’s juvenile justice systems. For example, many jurisdictions have reconsidered “the more sweeping question of whether too many juveniles are being tried in ‘adult’ court.”[1] Brief of the *139 Charles Hamilton Houston Inst. for Race & Justice and Criminal Justice Inst. as Amici Curiae in Support of Neither Party, Montgomery, — U.S. -, 136 S.Ct. 718, 193 L.Ed.2d 599 (No. 14-280), 2015 WL 4624172, at *11. Others have shortened the minimum term of incarceration juveniles must serve before parole eligibility.[2] Still others are working to improve juvenile justice by providing safer facilities[3] and greater access to rehabilitative programs.[4] All the foregoing tells us juvenile justice is undergoing significant and comprehensive reform. However, it also tells us that, in this time of feverish legislative action, no legislature has chosen to require a Miller-type hearing before imposing any minimum term of incarceration, and no legislature has chosen to make all juvenile offenders immediately eligible for parole.
Yet, we may broaden our inquiry to consider rapid changes in constitutional protections. See Lyle, 854 N.W.2d at 387. The State of Iowa was the first to prohibit sentencing juveniles to statutorily imposed mandatory mínimums. See id. at 386 (noting no court has constitutionally prohibited the practice, and most states permit or require minimum sentences). We are aware of one state supreme court that has since held similarly. See State v. Houston-Sconiers, 188 Wash.2d 1, 391 P.3d 409, 420 (2017) (“In accordance with Miller, we hold that sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of any juvenile defendant....” (Emphasis added.)). We also note courts are still in the midst of defining the new system of individualized hearings, with little uniformity emerging as to either when the hearing is required and what it should look like. Compare Landrum v. State, 192 So.3d 459, 467 (Fla. 2016) (concluding a Miller-type hearing is required before a sentencing court may impose a discretionary sentence of life without parole), with Foster v. State, 294 Ga. 383, 754 S.E.2d 33, 37 (2014) (finding Miller-type hearing inapplicable to discretionary sentence of life without parole). Compare Casiano v. Comm’r of Corr., 317 Conn. 52, 115 A.3d 1031, 1044 (2015) (concluding Miller applies to juvenile offenders sentenced to the “functional equivalent” of life without parole), with State v. Ali, 895 N.W.2d 237, 237-38 (Minn. 2017) (holding Miller only applies to the specific sentence of life without parole). Compare State v. Charles, 892 N.W.2d 915, 922-23 (S.D. 2017) (finding a resentencing hearing satisfied the standard announced in Miller), ivith People v. Berg, 247 Cal.App.4th 418, 202 Cal.Rptr.3d 786, 795 (2016) (finding a resentencing hearing failed to satisfy Miller). The Supreme Court has intervened only to say that parole eligibility is the simplest way to cure an otherwise constitutionally impermissible juvenile sentence. See Montgomery, 577 U.S. at -, 136 S.Ct. at 736. In all, we can foresee these challenges will continue, with frequency, for some time *140 before the Constitution’s role in sentencing juveniles is clarified.
We may also consider changes in professional opinion and scholarly commentary in finding consensus. See Sweet, 879 N.W.2d at 835-36. Many academics appear comfortable with the idea of either individualized sentencing or “a system of minimum sentences for juvenile offenders that are shorter in duration than those imposed on their adult counterparts.” Elizabeth Scott et al., Juvenile Sentencing Reform in a Constitutional Framework, 88 Temp. L. Rev. 675, 708 (2016) [hereinafter Scott]. But others assert the time has come to refocus on rehabilitative efforts, with a heavy emphasis on the availability of parole. See Martin Gardner, Youthful Offenders and the Eighth Amendment Right to Rehabilitation: Limitations on the Punishment of Juveniles, 83 Tenn. L. Rev. 455, 495 (2016) (“Rather than either parole release or individualized presentencing hearings, the best reading of Roper/Graham/Miller requires both”). As one commentator explains,
Given the Court’s acknowledgment of the pre-sentence impossibility of precisely distinguishing those juveniles whose crimes are one-time products of “transient immaturity” and those “rare [offenders] whose crime[s] reflect irreparable corruption,” rehabilitation programs within prison with parole release are necessary to effectuate a youthful offender’s right to a “meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.” Moreover, because rehabilitation can occur at any time and requires immediate release from prison upon its occurrence, it follows that mandatory minimum sentences can no longer be imposed on juvenile offenders if Graham is followed to its logical conclusions.
Id. at 495-96 (alterations in original) (footnotes omitted) (quoting Graham, 560 U.S. at 68, 75, 130 S.Ct. at 2026, 2030). In addition, the American Law Institute (ALI), in section 6.11A of its Model Penal Code: Sentencing, proposes the court must always have the “authority to impose a sentence that deviates from any mandatory-minimum term of imprisonment under state law,” in keeping with its “categorical disapproval” of mandatory penalty provisions. See Model Penal Code: Sentencing § 6.11A(f) & cmt. f, at 36, 43 (Am. Law, Inst., Tent. Draft No. 2, 2011). This section was approved in 2011, one year prior to the Supreme Court’s guidance in Miller. See Model Penal Code: Sentencing at xii (Am. Law. Inst., Tent. Draft No. 4, 2016). Even then, the ALI recognized the lessened blameworthiness of juvenile offenders, their potential for rehabilitation, and the lack of “persuasive empirical support for the proposition that increased punishment severity acts as an effective deterrent of criminal acts.” Model Penal Code: Sentencing § 6.11A cmt. c(5), at 41 (Am. Law. Inst., Tent. Draft No. 2). The ALI did not, however, discuss parole availability, aside from noting the then-recent Graham case. See id. at 44.
Finally, we consider the actions of our own legislature in determining consensus. See Lyle, 854 N.W.2d at 388. The Iowa legislature has recently adopted statutes that permit the sentencing court to depart from statutory mínimums. See 2015 Iowa Acts ch. 65, § 1 (now codified at Iowa Code § 902.1(2)(ffi)(2) (2017)) (authorizing the court to sentence a juvenile convicted of a class “A” felony to “life with the possibility of parole after serving a minimum term of confinement as determined by the court”); 2013 Iowa Acts ch. 42, § 14 (now codified at Iowa Code § 901.5(14)) (“Notwithstanding any provision ... prescribing a mandatory minimum sentence for the offense, if the defendant ... was *141 under the age of eighteen at the time the offense was committed, the court may suspend the sentence in whole or -in part, including any mandatory minimum sentence .... ”). We give substantial “deference to the legislature when it expands the discretion of the court in juvenile sentencing” because it “can be ‘the-most reliable objective indicator[] of community standards for purposes of determining whether a punishment is cruel and unusual.’ ” Lyle, 854 N.W.2d at 388 (quoting State v. Bruegger, 773 N.W.2d 862, 873 (Iowa 2009)). We find “the Code in general is replete with provisions vesting considerable discretion in courts to take action for the best interests of the child.” Id. at 388-89 (citing as examples Iowa Code section 92.13; section 232C.3(1), and section 282.18(5)). We can infer from these latest legislative developments that the Iowa legislature has embraced the notion of court discretion when initially sentencing juveniles. To contrast, there is no indication the Iowa legislature would forbid the court from imposing a minimum sentence. ’
In all, no national or community consensus readily emerges to support Roby’s claim. This “gives us pause.” Sweet, 879 N.W.2d at 836. In Roper, the Court observed “even in the 20 States without a formal prohibition on executing juveniles, the practice is infrequent.” Roper, 543 U.S. at 564, 125 S.Ct. at 1192. The rate of legislative change, too, was significant. Id. at 565, 125 S.Ct. at 1193. Similarly, in Graham, the Court found the ability to impose life without parole on juveniles existed widely, but was seldom used except in certain jurisdictions. See Graham, 560 U.S. at 62-64, 130 S.Ct. at 2023-24. After Graham, many states acted to forbid the practice. See Sweet, 879 N.W.2d at 835. In contrast apparently every state permits a minimum sentence. Moreover, the growing body of constitutional challenges and professional criticism is still being tested. And finally, our legislature has recently reauthorized minimum sentences at the discretion of the sentencing court. This all shows us the individualized hearing process is still being defined, and it will likely not be the last reform.
B. Independent Judgment. Since consensus is not dispositive of our inquiry, we turn to our own independent judgment. See id. at 836. By that, we mean we carefully consider if available information and evidence would support the categorical elimination of the practice of sentencing juvenile' offenders to a minimum prison term with no opportunity for parole. It is our duty to use this type of consideration, as “Iowans have generally enjoyed a greater degree of liberty and equality because we do not rely on a national consensus regarding fundamental rights without also examining any new understanding.” Lyle, 854 N.W.2d at 387. To this, we note the “watershed”-like change in juvenile justice over the last decade is not complete. Id. at 390; Cara H. Drinan, The Miller Revolution, 101 Iowa L. Rev. 1787, 1825 (2016) [hereinafter Drinan] (addressing “three areas ripe for reform in the wake of Miller. (1) juvenile transfer laws; (2) presumptive sentencing guidelines as they apply to children; ánd (3) juvenile conditions of confinement”). In many ways, we are still understanding how brain science can make our juvenile justice system better. However, the State argues the opportunity to be eligible for parole provides the needed bulwark against overly harsh mandatory minimum sentences, and we have reached this particular watershed’s common outlet. We turn to our body of cases to see if more can be found to support Roby’s categorical argument.
In Lyle, we found our constitution prohibited statutorily imposed mandatory mínimums. See Lyle, 854 N.W.2d at 404. Our reasoning began with twin principles: *142 (1) Juveniles have diminished culpability, and (2) penological justifications are less applicable to them. Id. at 393-94. We look to see if these principles also prohibit judicially imposed minimum sentences. We find the first is equally applicable to every juvenile, whether subjected to a statutorily or judicially imposed minimum sentence. Juveniles “are not fully equipped to make ‘important, affirmative choices with potentially serious consequences.’ ” Id. at 397 (quoting Bellotti v. Baird, 443 U.S. 622, 635, 99 S.Ct. 3035, 3044, 61 L.Ed.2d 797 (1979)). They lack maturity and the ability to make reasoned decisions, they are susceptible to outside influence, and they will likely change. See Roper, 543 U.S. at 569-70, 125 S.Ct. at 1195. As noted in Miller and Lyle, nothing about this is crime or punishment specific. Miller, 567 U.S. at 472-73, 132 S.Ct. at 2465; Lyle, 854 N.W.2d at 399. Therefore, whether the punishment is handed down by the legislature or the court, a juvenile’s diminished culpability means it risks being excessive.
The second principle, diminished peno-logical justifications, is less compelling when a court is given discretion to impose a minimum sentence. For example, statutorily imposed mandatory mínimums are not appropriate retribution because “attempting to mete out a given punishment to a juvenile for retributive purposes irrespective of qn individualized analysis of the juvenile’s categorically diminished culpability is an irrational exercise.” Lyle, 854 N.W.2d at 399. But judicially imposed mandatory mínimums only follow a hearing on “the culpability of the offender in addition to the harm the offender caused.” Id. at 398. Thus, it may be appropriate retribution to incarcerate a juvenile for a short time without the possibility of parole. Additionally, a sentencing judge could properly conclude a short term of guaranteed incarceration is necessary to protect the public.
On the other hand, although we used the phrase “statutorily mandated,” we have recognized incarceration “[ajfter the juvenile’s transient impetuosity ebbs and the juvenile matures and reforms ... becomes ‘nothing more than the purposeless and needless imposition of pain and suffering.’ ” Id. at 400 (quoting Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977)). Therefore, even a judicially imposed minimum may quickly exceed the sentence necessary to punish the juvenile offender. Additionally, the justification of deterrence will normally be irrelevant to all juveniles. See id. at 399 (“If a juvenile will not engage in the kind of cost-benefit analysis involving the death penalty that may deter them from committing a crime, there is no reason to believe a comparatively minor sentence of a term of years subject to a mandatory minimum will do so.”).
Finally, we note all minimum sentences tend to obstruct rehabilitation. Studies show incarcerating juveniles increases the risk of recidivism by depriving the juvenile of positive influences during a crucial time for development. See id. at 400 (“Juvenile offenders who are placed in prison at a formative time in their growth and formation can be. exposed to a life that can increase the likelihood of recidivism.” (Citation omitted.)). Perhaps the initial shock of incarceration may scare some juveniles “straight,” but the damaging effects of the prison environment on juvenile development are well documented and severe. See, e.g., Katherine Hunt Federle, The Right to Redemption: Juvenile Dispositions and Sentences, 77 La. L. Rev. 47, 59-64 (2016) (identifying increased recidivism, higher rates of abuse and health problems, reduced opportunities, and delayed maturation as collateral consequences of incarcerating juvenile offenders). This is true of all juveniles held with minimum sentences *143 and is likely made worse by apparent Iowa Department of Corrections policy leaving them ineligible for rehabilitative treatment until they near them discharge date.
Thus, “[i]f rehabilitation were the sole proper goal, it would follow that all sentences for juveniles should come with immediate parole eligibility.” Seats, 865 N.W.2d at 580-81 (Mansfield, J., dissenting). This has not been the approach since the progressive reformers of the late nineteenth century. See Lyle, 854 N.W.2d at 390 (“To ameliorate the harshness and inequity of trying children in adult courts ..., reformers advocated for the establishment of a system less concerned with ascertaining the child’s guilt or innocence and more concerned with determining what was in the child’s best interests based upon the child’s unique circumstances.”); see also Null, 836 N.W.2d at 52 (noting juvenile courts were originally intended to “promote the welfare of juvenile offenders”). While many may believe it is time for a complete restructuring of the juvenile justice system to return us to that understanding, we have never indicated such a change was constitutionally mandated.
Instead, we repeatedly limited our holding in Lyle to statutorily imposed míni-mums. We stated expressly,
It is important to be mindful that the holding in this case does not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed, nor does it prohibit the legislature from imposing a minimum time that youthful offenders must serve in prison before being eligible for parole. Article I, section 17 only prohibits the one-size-fíts-all mandatory sentencing for juveniles. Our constitution demands that we do better for youthful offenders—all youthful offenders, not just those who commit the most serious crimes. Some juveniles will deserve mandatory minimum imprisonment, but others may not. A statute that sends all juvenile offenders to prison for a minimum period of time under all circumstances simply cannot satisfy the standards of decency and fairness embedded in article I, section 17 of the Iowa Constitution.
Lyle, 854 N.W.2d at 403. We expressly authorized our judges to “sentence those juvenile offenders to the maximum sentence if warranted and to a lesser sentence providing for parole if warranted.” Id. at 404. In fact, “[i]f the mandatory minimum period of incarceration is warranted,” we commanded them to impose the sentence. See id. at 404 n.10.
In sum, applying the two-step inquiry we use for categorical challenges, we can conclude, at this time, (1) there is no national or community consensus against imposing minimum terms of incarceration without the possibility of parole on juveniles, provided they have the opportunity to appear before a neutral decision-maker for an individualized review; and (2) in our independent judgment article I, section 17 does not yet require abolition of the practice.
C. Practical Difficulties. Notwithstanding, Roby argues the practical difficulties in applying the Lyle factors are so substantial that we should abandon the practice in favor of a categorical prohibition that would require immediate eligibility for parole. He also points to the efficacy of the parole board and the procedural difficulties of challenging the action or inaction of the parole board.
The linchpin of the constitutional protection provided to juveniles is individualized sentencing. We have on numerous occasions discussed the nature of this sentencing and the role of the court in imposing the sentence. See e.g., Seats, 865 N.W.2d at *144 555-56 (majority opinion); Lyle, 854 N.W.2d at 404 n.10; Null, 836 N.W.2d at 74-75. We endorse the five factors identified in Miller as guideposts for courts to follow. Lyle, 854 N.W.2d at 404 n.10. Yet, as this case and others illustrate, difficulties in applying the factors are obvious. See Sweet, 879 N.W.2d at 838.
Nevertheless, we are not prepared to conclude that practice has proven the five factors to be unworkable. Instead, the difficulties in applying the factors are a call for clearer guidance to permit them to supply the required protection demanded by our constitution. This observation is not a criticism in any way, but a recognition that justice advances in steps.
The five factors were drawn from the reasons that created the fundamental constitutional proposition that harsh criminal sentences are no longer appropriate for juvenile offenders. They are woven from the growing body of scientific research and represent our current and best understanding of the distinct features of human development. Our laws have always sought to give special consideration to youth. Our ability to integrate this consideration into the law simply gets better over time as our understanding improves. The change that results from this understanding is what a justice system gives a democracy when it is doing its job under the Constitution. It is what the Supreme Court did fifty years ago in In re Gault when it changed the historic approach to dealing with juvenile offenders and recognized that youthful offenders are constitutionally entitled to the same type of procedural protections provided to other criminal offenders. 387 U.S. 1, 27-28, 87 S.Ct. 1428, 1444, 18 L.Ed.2d 527 (1967). It reached this conclusion based in large measure on research showing procedural fairness promotes rehabilitation and reform. See id. at 26, 87 S.Ct. at 1443.
We also recognize that our constitution establishes a baseline, and courts are not alone in developing new standards to protect juvenile offenders from overly harsh sentencing. The legislature is uniquely suited to identifying and adopting additional substantive and procedural protections to further the constitutional recognition that “children are different.” See Seats, 865 N.W.2d at 555 (quoting Miller, 567 U.S. at 478-80, 132 S.Ct. at 2469). For example, our legislature has already acted to authorize sentencing courts to suspend or defer the sentences of juveniles. See Iowa Code § 901.5(14). We would call attention to other efforts advocated by leading scholars in this area, such as reforming juvenile transfer laws, establishing appropriate facilities for juvenile confinement, sealing and expunging juvenile criminal records, and expanding access to educational and treatment programs while incarcerated, to name a few. See Drinan, 101 Iowa L. Rev. at 1825-26, 1828-31; Scott, 88 Temp. L. Rev. at 708-09, 712. Thus, we too now turn back to understand why the factors have led to difficulties and to consider what can be done to provide greater guidance.
In doing so, we begin by emphasizing some basic propositions we have previously described. First, the factors generally serve to mitigate punishment, not aggravate punishment. Lyle, 854 N.W.2d at 402 n.8. Second, juvenile sentencing hearings are not entirely adversarial. The goal is to craft a “punishment that serves the best interests of the child and of society.” Id. at 402. Third, the default rule in sentencing a juvenile is that they are not subject to minimum periods of incarceration. See Null, 836 N.W.2d at 74 (“First, the district court must’ recognize that because ‘children are constitutionally different from adults,’ they ordinarily cannot be held to the same standard of culpa *145 bility as adults in criminal sentencing.” (quoting Miller, 567 U.S. at 470-72, 132 S.Ct. at 2464)).
Finally, we note these factors have unique challenges on resentencing. ■ Objective indicia of a juvenile’s relevant characteristics may be difficult or impossible to obtain ten or twenty years later. However, the factors do not lose relevance. There are baseline “average developmental characteristics of youth of the age that the prisoner was when he or she committed the offense,” which the parties can then use as evidence of the juvenile’s conduct after the offense to show the juvenile “conformed to or departed from developmental norms.” Scott, 88 Temp. L. Rev. at 702, Additionally, while objective indicia may be elusive, it may still be available in the form of contemporaneous medical records or school and disciplinary reports. Id. Interviews of relevant individuals’ recollection, as opposed to their current perception, may also be helpful. See id. Applied to this record, we are not. prepared to assume these inquiries were made but returned nothing.
D. The Individualized Hearing. Accordingly, we turn to analyze each factor to provide greater understanding of its role in juvenile sentencing. Properly applied, these factors ensure the constitutional guarantee against cruel and unusual punishment is satisfied.
1. Age and features of youthful behavior. The first factor is the “age of the offender and the features of youthful behavior.” Lyle, 854 N.W.2d at 404 n.10 This factor is the basis for the core constitutional protection extended to juvenile offenders. See. id. at 398 (“First and foremost, the time when a seventeen-year-old could seriously be considered to have adult-like culpability has passed.”). The features.of age that give rise to this protection include “immaturity, impetuosity, and [a] failure to appreciate risks and consequences.” Id. at 404 n.10 (quoting Miller, 567 U.S. at 477-78, 132 S.Ct. at 2468). The factor draws upon the features expected to be exhibited by youthful offenders that support mitigation and allows for the introduction of: evidence at the sentencing hearing to show the offender had more or less maturity, deliberation of thought, and appreciation of risk-taking than normally exhibited by juveniles. This factor is most meaningfully applied when based on qualified professional assessments of the offender’s deci-sional capacity. See Scott, 88 Temp. L. Rev. at 696-97 (describing use of “validated assessment methods,” review of “the youth’s facility under real-life condition's,” and an expert’s “developmental and clinical knowledge and experience to integrate [the] information”).
Additionally, age is not a sliding scale' that necessarily weighs against mitigation the closer the offender is to turning eighteen years old at the time of the crime. See Elizabeth S. Scott et al., Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy, 85 Fordham L. Rev. 641, 647 (2016) (noting “developmental changes ... continue into the early twenties”). When the Miller Court referred to “chronological age” in identifying the need to distinguish the criminal sentencing of children from adults, it did- not suggest that a seventeen-year-old child is more deserving of adult punishment than a sixteen-year-old child, or a fifteen-year-old child more deserving than a fourteen-year-old child. See Miller, 567 U.S. at 476, 132 S.Ct. at 2467 (“[Y]outh is more than a chronological fact.” (quoting Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982))). It referred to “chronological age” as a unit of age that distinguishes children from adults. See id. The court recognized that children within this *146 unit have “signature qualities” of “immaturity, irresponsibility, ‘impetuousness[,] and recklessness.’” Id. (alteration in original) (quoting Johnson v. Texas, 509 U.S. 350, 368, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993)). Thus, minority status is the designated factor that supports the special sentencing consideration and expert evidence may be used to conclude any particular juvenile offender possessed features of maturity beyond his or her years. This is not to say judges cannot and should not be alert to circumstances that might suggest the age of a particular offender might not support mitigation. Yet, categorical age groups do not exist for children to justify using age alone as a factor against granting eligibility for parole.
2. Family and home environment. The second factor is “the particular ‘family and home environment’ that surround the youth.” Lyle, 854 N.W.2d at 404 n.10 (quoting Miller, 567 U.S. at 477-78, 132 S.Ct. at 2468). This factor seeks to identify any familial dependency and negative influences of family circumstances that can be ingrained on children. Scott, 88 Temp. L. Rev. at 698. As with the first factor, expert testimony will best assess how the family and home environment may have affected the functioning of the juvenile offender. Id. (describing the use of “psychometric measures,” including “‘social maturity scales’ ... [that] assess the youth’s degree of independence and self-direction in everyday functioning”). This factor does not rely on general perceptions, but specific measures of the degree of functioning. Furthermore, it is not limited to extremely brutal or dysfunctional home environments, but considers the impact of all circumstances and all income and social backgrounds.
3. The circumstances of the crime. The third factor considers the circumstances of the crime. Lyle, 854 N.W.2d at 404 n.10. Within these circumstances, attention must be given to the juvenile offender’s actual role and the role of various types of external pressure. Thus, this factor is particularly important in cases of group participation in a crime. Expert testimony will be helpful to understand the complexity behind the circumstances of a crime when influences such as peer pressure are not immediately evident and will aid the court in applying the factor properly. See Scott, 88 Temp. L. Rev. at 698. Yet, the prominence of peer pressure in the analysis of this factor does not mean the factor cannot support mitigation for crimes committed alone. See id. (“[P]eer influence can play a more subtle role in adolescent behavior, as when teenagers engage in behavior that they think will win peer approval (‘showing off,’ for example), or simply encourage one another through group interaction.”). Likewise, the circumstances of the crime do not necessarily weigh against mitigation when the crime caused grave harm or involved especially brutal circumstances. As the Court said in Miller, the special analysis for juveniles is not “crime-specific.” 567 U.S. at 473, 132 S.Ct. at 2465. Mitigation normally is warranted in all crimes. The aggravating circumstances of a crime that suggest an adult offender is depraved may only reveal a juvenile offender to be wildly immature and impetuous.
4. Legal incompetency. The fourth factor is the legal incompetency associated with youth. Lyle, 854 N.W.2d at 404 n.10. It mitigates against punishment because juveniles are generally less capable of navigating through the criminal process than adult offenders. See Scott, 88 Temp. L. Rev. at 699. Thus, the same shortsightedness of thought tied to juvenile behavior in the commission of a crime can also surface in their subsequent dealings in the legal process. These juvenile *147 deficiencies can play out in general competency to stand trial or relate more specifically to cognitive or other incapacities to withstand police interrogation. See id. The relevance of this factor ultimately relates to the general proposition that youthful offenders are less able to confront the legal process. Whether a particular youth would be more capable than most would normally be a matter for expert testimony.
5. Rehabilitation. The final factor is the possibility of rehabilitation and the capacity for change. Lyle, 854 N.W.2d at 404 n.10. This factor supports mitigation for most juvenile offenders because delinquency is normally transient, and most juveniles will grow out of it by the time brain development is complete. See Scott, 88 Temp. L. Rev. at 700. Additionally, juveniles are normally more malleable to change and reform in response to available treatment. Id. at 701. The seriousness of the crime does not alter these propositions. Id. at 700. Thus, judges cannot necessarily use the seriousness of a criminal act, such as murder, to conclude the juvenile falls within the minority of juveniles who will be future offenders or are not amenable to reform. Again, any such conclusion would normally need to be supported by expert testimony. Id. at 701.
6. Discretion exercised by the district court. We appreciate the difficulty judges can often face when called upon to decide if juvenile offenders should be eligible for parole. Yet, the factors used to apply the constitutional principle at stake in this decision will best serve their purpose if sentencing courts remain committed to several key observations. First, the five factors identify the primary reasons most juvenile offenders should not be sentenced without parole eligibility. A sentence of incarceration without parole eligibility will be an uncommon result. Second, the factors must not normally be used to impose a minimum sentence of incarceration without parole unless expert evidence supports the use of the factors to reach such a result. Third, the factors cannot be applied detached from the evidence from which they were created and must not be applied solely through the lens of the background or culture of the judge charged with the responsibility to apply them. Perceptions applicable to adult behavior cannot normally be used to draw conclusions from juvenile behavior.
In the end, this case shows how the factors can be misused. The district court in this case misused the first factor—age and the features of youthful behavior—by considering the evidence at trial that Roby continued to engage in sexual abuse after he was confronted about his improper physical contact with the victim. This evidence does not in any way undermine the recognized failure of juveniles to appreciate risks and consequences and their tendency to make immature and impetuous decisions. Thus, the finding by the district court could have only been based on the court’s own observation that the features of youth are overcome by the warning Roby received. No such evidence supported this finding.
The district court addressed the second factor—family and home environment—with evidence that Roby sexually abused the victim during the time the victim’s family was providing him with a home. Again, this evidence does not undermine what the second factor seeks to convey—that family and home environment often can affect the functions of a juvenile. Thus, the finding by the district court was essentially unrelated to the factor. The district court seemed to suggest Roby acted with a sinister disposition by abusing the victim while the victim’s family was helping provide him with a home.
*148 The district court addressed the third factor—the circumstances of the crime—with evidence that the crime was not the result of peer pressure, Roby exhibited no concern for harm caused to the victim, and he betrayed the kindness of the victim’s family. The role of peer pressure in juvenile crime does not make the absence of peer pressure an aggravating circumstance. Furthermore, a sentencing judge cannot normally draw such conclusions from the circumstances of the crime without expert testimony.
The district court in this case did not consider the fourth factor—legal incompetency. If this factor had been considered, the evidence showed Roby initially thought or pretended to think he was being investigated for stealing a video game, confessed to police during an interrogation that was subsequently suppressed by the court as involuntary, and may not have been adequately communicating on trial strategy with his attorney. All of this could be evidence of the legal incompetency we normally associate with youth.
Finally, the court addressed the fifth factor—rehabilitation—with evidence that Roby never admitted his criminal actions arid has continued to deny committing a crime. It concluded this attitude did not make him amenable to rehabilitation. While this evidence is relevant, no evidence was presented that Roby ever received any treatment to aid in rehabilitation. Overall, ■ the evidence at sentencing was insufficient to support a conclusion that Roby was within the small group of juvenile offenders that never aged out of his delinquent conduct or was not amenable to rehabilitation.
7. Summary. On our review of the five factors identified in Lyle, bolstered by the recommendations of leading legal and medical professionals in this area, we conclude the district court abused its discretion by imposing a sentence of incarceration without parole eligibility. The evidence presented at the sentencing hearing could not, as a matter of law, support the imposition of incarceration without an opportunity for parole under the five factors that must be observed at sentencing to ensure that the punishment does not violate article I, section 17 of the Iowa Constitution. The district court applied the factors, but not in the manner required to protect the juvenile offender from cruel and unusual punishment.
IV. Conclusion.
We conclude article I, section 17 of the Iowa Constitution does not categorically prohibit the imposition of a minimum term of incarceration without the possibility of parole on a juvenile offender, provided the court only imposes it after a complete and careful consideration of the relevant mitigating factors of youth. We recognize the difficulties of individualized hearings, but decline at this time to hold our constitution requires abandonment of the practice. Instead, we take this opportunity to provide additional guidance to our courts, attorneys, and juveniles on the use of the factors and the content of a sentencing hearing. While we conclude the district court abused its discretion in this case, we are confident the additional direction provided by this case will lead to sentencing more consistent with our constitutional principles.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED AND CASE REMANDED WITH INSTRUCTIONS.
Wiggins and Appel, JJ., join this opinion. Hecht, J., files a concurring opinion. Appel, J., files a separate concurring opinion in which Wiggins, J., *149 joins. Zager, J., files a dissenting opinion in which Waterman, and Mansfield, JJ., join.

. See, e.g., Cal. Penal Code § 1170.17(b)(2)(A)-(E) (West, Westlaw current through ch. 9 of 2017 Reg. Sess.); Colo. Rev. Stat. Ann. § 19-2-517(l)-(3), (6)-(10) (West, Westlaw current through Laws effective April 28, 2017); Ind. Code. Ann. § 31-30-l-4(c) (West, Westlaw current through 2017 First Reg. Sess.)

.See, e.g., Cal. Penal Code § 3051(b)(1)—(3) (West, Westlaw current through ch. 9 of 2017 Reg. Sess.); Conn. Gen. Stat. Ann. § 54-125a(f)(l) (West, Westlaw current through May 31, 2017); Del. Code Ann. tit. 11, § 4204A(d)(l) (West, Westlaw current through 81 Laws 2017, chs. 1-15); Nev. Rev. Stat. Ann. § 213.12135(l)(a)-(b) (West, West-law current through 79th Reg. Sess. 2017); W. Va. Code Ann. § 61-ll-23(b) (West, West-law current with 2017 Reg. Sess. through March 14, 2017).

. See, e.g., Conn. Gen. Stat. Ann. § 17a-22bb(f)-(g) (West, Westlaw current through May 31, 2017); Kan. Stat. Ann. § 75-7023(d)-(f) (West, Westlaw current through May 18, 2017).

. See, e.g., Mich. Comp. Laws Ann. § 791.262d(3)(a)-(b) (West, Westlaw current through No. 42 of the 2017 Reg. Sess.).