# IN THE COURT OF APPEALS OF IOWA

No. 23-1058
Filed August 7, 2024

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ETHAN ALEXANDER ORTON,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Linn County, Ian K. Thornhill, Judge.

The defendant challenges the sentence imposed following his guilty plea to two counts of first-degree murder, which he committed when he was seventeen years old. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Linda J. Hines, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., and Greer and Schumacher, JJ. Chicchelly, J., takes no part.

**GREER, Judge.**

Ethan Orton pled guilty to two counts of first-degree murder, class "A" felonies, in violation of Iowa Code sections 707.1 and 707.2(1)(a) (2021), that he committed as a juvenile. He was seventeen years and seven months old when he stabbed both of his parents and hit his mother with an ax multiple times, resulting in their deaths. Attacking the sentence imposed under three theories, Orton asserts the court abused its discretion by sentencing him to a fifty-year minimum term of incarceration. Orton argues the court failed to: (1) start from a presumption against a minimum term of incarceration, (2) properly apply the constitutional juvenile-sentencing factors, and (3) adequately explain its sentencing decision.[1] After consideration of his arguments, we affirm the sentence imposed.

**I. Procedural Background.**

After Orton pled guilty to the two felony counts, at a separate sentencing hearing, the court explained that Orton "is free to argue for, essentially, no minimum or any term of minimum years before [he] can be eligible for parole and the State could do the same." The court asked Orton if he agreed with that summary of the parameters of juvenile sentencing, and Orton responded that he agreed with the court's summary and had nothing else to add. The court then clarified that if it

> were to impose just a life sentence and no more than the standard rules of the parole board or wherever they may be or however they would be applied to [Orton], the Court after doing an individualized determination in this case [could] decide to set a minimum number of years for . . . Orton to serve as part of that life sentence, then he

---

[1] Orton has a right to appeal from his guilty plea of the class "A" felonies. *See* Iowa Code § 814.6(1)(a)(3).

> would not be eligible for parole until those minimum number of years minus any credit he might get for serving that time would expire.

Orton stated that he also agreed with that summary.

Because Orton was a juvenile at the time he committed the offenses, the court explained that it was to consider certain circumstances, called the *Miller/Lyle/Roby* factors,[2] before imposing a minimum term of incarceration. To address some of those circumstances and the implications for sentencing, two experts testified. After hearing from the experts, reviewing the presentence investigation report, and listening to Orton's allocution and each party's recommendations, the court sentenced him to two terms of life in prison with fifty-year minimums before Orton becomes eligible for parole, with the terms to be served concurrently. It is from this sentence that Orton appeals.

**II. Standard of Review.**

"[T]he decision of the district court to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor, and [it] will only be overturned for an abuse of discretion or the consideration of inappropriate matters." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). To establish an abuse of discretion, the defendant bears the burden to affirmatively show that the district court relied on improper factors or clearly untenable grounds. *State v. Sailer*, 587 N.W.2d 756, 759, 762 (Iowa 1998).

---

[2] These factors come from *Miller v. Alabama*, 567 U.S. 460 (2012) and *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014). They were clarified in *State v. Roby*, 897 N.W.2d 127 (Iowa 2017). Our supreme court referred to them as the *Miller/Lyle/Roby* factors first in *Goodwin v. Iowa District Court*, 936 N.W.2d 634, 637 (Iowa 2019). We use that terminology here.

**III. Discussion.**

Specific to individuals who committed a class "A" felony while under the age of eighteen, Iowa Code section 902.1(2)(a) lists sentencing options that include a life sentence with either immediate parole eligibility or parole eligibility after serving a minimum set term. To start, as was done here, a court must consider the *Miller/Lyle/Roby* factors in an individualized sentencing hearing with support from expert testimony when it is contemplating imposing a mandatory minimum sentence on an offender who was a juvenile at the time of the offense. *Roby*, 897 N.W.2d at 148. Those five specific mitigating factors to consider when sentencing juveniles are:

> (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477–78). "[A] sentencing court must consider the five [*Miller/Lyle/Roby*] factors in a mitigating fashion in the juvenile sentencing process, and the consideration of any potential aggravating factors, including the circumstances of the crime, cannot overwhelm the sentencing court's analysis." *State v. Zarate*, 908 N.W.2d 831, 854 (Iowa 2018).

Yet, when reviewing sentences for juvenile offenders, we cannot merely rubber-stamp the trial court's sentencing decision, but should ensure that the sentencing court has properly applied the *Miller/Lyle/Roby* factors. *Roby*, 897 N.W.2d at 148. "[I]f the court follows our outlined sentencing procedure by

conducting an individualized hearing, applies the *Miller/Lyle/Roby* factors, and imposes a sentence authorized by statute and supported by the evidence, then we affirm the sentence." *State v. Majors*, 940 N.W.2d 372, 387 (Iowa 2020); *accord id.* at 388–91 (describing in detail the analysis required for each factor). In addition, "[o]ur district courts can and should weigh public safety (incapacitation), deterrence, and retribution when sentencing juvenile offenders for violent felonies." *Goodwin*, 936 N.W.2d at 647 (reviewing a sentence for second-degree murder).

**1. The Presumption Challenge.**

Orton points to two of the court's statements during its consideration of the *Miller/Lyle/Roby* factors that he contends show the court "began with a presumption for a minimum term, rather than against." The first came when the court said the expert testimony and use of *Miller/Lyle/Roby* factors serve "to make an individualized determination of what the minimum sentence should be for these offenses" and the second was a comment that Orton's family and home life did not "justify significant deviation here as far as what the ultimate minimum sentence should be." Framed that way, Orton argues the comments show that the court misapplied the presumption against a minimum incarceration that should have been in Orton's favor. Instead, in his view, the court applied a presumption in favor of a minimum-incarceration term.

"[T]he default rule in sentencing a juvenile is that they are not subject to minimum periods of incarceration." *Roby*, 897 N.W.2d at 144. But at the onset of the sentencing hearing, the court confirmed that it was following the parameters established under *Null*, *Lyle*, and *Zarate*, along with guidance from Iowa Code section 915.5(13), and it recognized that Orton could advocate for any allowable

sentence. The court also clarified that an individualized determination would be required before deciding to impose a minimum number of years as a part of the life sentence.

After the experts testified, each party detailed their recommendations for sentencing—the State recommended a minimum sentence of fifty years with the sentences to run concurrently, and Orton requested parole after a minimum term of ten years with the sentences running concurrently. And it is noteworthy that the comments Orton points to came after the court was asked by both parties to assess a minimum sentence, albeit of different lengths. Because the court then examined the *Miller*/*Lyle*/*Roby* factors specific to Orton's circumstances, we do not find that the court misinterpreted its role in appropriately applying the presumption against a minimum term of incarceration.

**2. Assessment of Mitigating-Factors Challenge.**

Here, Orton faults the court for not giving sufficient weight to the *Miller*/*Lyle*/*Roby* factors: proximity to age eighteen, home and family life, circumstances of the offense, difficulty navigating the criminal justice system, and his potential for rehabilitation. Orton also complains that the court overly emphasized the competency finding as a non-mitigating factor, instead of considering it as a separate unrelated consideration for a different day. As to the factors, the court had the benefit of detailed expert reports and testimony that addressed the factors it had to consider.

First, Orton called his expert, Dr. Tracy Thomas, a forensic psychologist, who had reviewed a previously authored competency report,[3] court filings, discovery and interviewed Orton on two occasions. She stated that Orton grew up in "a very chaotic household. . . . His parents were often dismissive, demeaning of him, belittling, harsh, so there was a definite mismatch between his needs and his parents' approach to dealing with him." Based upon this history, Dr. Thomas described Orton's issues as being very complex and having a lot to do with personality dysfunction, the mismatch between his temperament and his parents' parenting approach, and his defense mechanisms and coping skills. She also reported that Orton had no prior criminal history and she was unaware of any violent behavior or history of mental-health treatment or diagnoses from Orton prior to when he killed his parents. However, from her evaluation, Dr. Thomas opined that Orton had a disorganized attachment style. She also determined that he was at low risk for future violence and had a high level of maturity or sophistication. When asked if she believed that Orton had the ability to appreciate the criminality of his conduct, she said, "No, I think at the time that this happened his cognitive faculties were sufficiently disintegrated, that he was not even considering that. He wasn't consciously thinking about that issue." But in response to a follow-up question, Dr. Thomas clarified that Orton had "the cognitive skills" to appreciate the criminality of his actions. Lastly, she noted that Orton has the potential for

---

[3] Dr. Arnold Andersen at the Iowa Department of Corrections performed an evaluation of Orton, determining he was qualified to stand trial. After a January 2022 hearing, the court found Orton competent to stand trial.

rehabilitation. On cross-examination, she agreed that "this was a particular[ly] brutal crime."

The State called clinical neuropsychologist Dr. Daniel Tranel, who also reviewed the competency report and Dr. Thomas's report and evaluated Orton under various testing as well. Regarding Orton's age at the time of the offense—five months shy of eighteen—he stated that it was "not a materially significant difference" from an eighteen-year-old adult "psychologically or cognitively." For that reason, Dr. Tranel did not feel that Orton's age "would mitigate anything about this offense." He added, regarding Orton's family and home environment, that he "did not see anything profoundly abnormal or severely wrong with his developmental environment" and thus it would also not mitigate Orton's responsibility. Because no one else was involved in the planning of the crime, Tranel also believed that the circumstances of the crime did not provide any mitigation. However, Dr. Tranel agreed with Dr. Thomas that Orton "has potential for rehabilitation and change." Yet during cross-examination, Dr. Tranel agreed that he rarely evaluated patients under age eighteen in his clinic.

At this point, the court asked Orton and the State for their recommendations. The State recommended "a life sentence for each of the charges for which [Orton has] pled guilty and then in each of those sentences that he be given a minimum sentence of [fifty] years and those sentences to run concurrent to each other." The State explained that it made that recommendation for a minimum sentence because it did not believe that any of the factors reported by Dr. Tranel were mitigating other than Orton's potential for rehabilitation. Orton recommended a term of imprisonment of a minimum of ten years, stating that he believed he did

not appreciate the criminal nature of his conduct, that he had never been given the opportunity to work with a mental-health professional, and he "is a good candidate for rehabilitation." Furthermore, he argued that "[t]his will allow for [him] to receive multiple years of rehabilitative therapy while his brain is still developing, as well as for a number of years after it has developed." He emphasized the dysfunction of his family and impact on him leading to this criminal act.

When pronouncing the sentence, the court explained that "[t]he question before the Court here today and the evidence the Court heard today deals with what, if any, but, essentially, what minimum amount of time should [Orton] be required to serve before he's eligible for parole." The court concluded, following an individualized determination, that it did not find Orton's "age is that much of a mitigating factor here because . . . he [was] so close to the age of [eighteen]" at the time of the offense. And the court noted that Orton's cognitive abilities and performance in school were normal. Even Dr. Thomas conceded that there would not be much change in Orton's brain development between a person age seventeen years and seven month and an eighteen-year-old person and that Orton had a "relatively high level of maturity." Furthermore, "to the extent that the parents' treatment of . . . Orton was not ideal and probably somewhat distasteful to a lot of us . . . it provides some mitigation" but does not "rise to the level of a serious factor in the Court's mind that would justify significant deviation here as far as what the ultimate minimum sentence should be." Ultimately, "[i]t was very brutal crimes that took these two individuals' lives" and, the court found "the sentence imposed offers [Orton] the maximum opportunity for rehabilitation balanced against the interest in protecting the community and, again, all of the other items

that I recited in my analysis." As for the mitigating factor that both experts agreed was present, Orton's potential for rehabilitation, the court noted it was an "important factor" and did weigh it along with the concerns about public safety and deterrence. The court included a similar statement in its written sentencing order.

Based upon the court's consideration of the *Miller/Lyle/Roby* factors after hearing from experts at the individualized hearing at sentencing, we find no abuse of discretion in the sentencing court's imposition of the fifty-year minimum sentence.

**3. Failure to Explain the Imposition of the Fifty-Year Sentence.**

Although the court imposed a fifty-year minimum sentence, Orton argues little was said to explain the reasons for that decision, except a comment from the court that the term was not tantamount to a life sentence without parole because Orton would be sixty-seven years old at the time of his release, "recognized in a lot of circles as the age of retirement, so we know life is not over at [sixty-seven]." As a reviewing court, we are helped by a detailed record of sentencing reasons and here, the written order included other considerations not specifically mentioned at the hearing. *See State v. Hill*, 878 N.W.2d 269, 275 (Iowa 2016) ("We encourage sentencing courts to give more detailed reasons for a sentence specific to the individual defendant and crimes . . . ."). Likewise, the court confirmed it looked at all of the *Miller/Lyle/Roby* factors and their interplay with other legitimate concerns and rationale for sentencing. And, on top of that, the court summarized the decision by noting:

> In determining this sentence I considered, in addition to all of the information I've just recited here on the record, I also included in my consideration the information contained in the presentence

investigation report, which gave me information including the history and characteristics of the Defendant, but again, those played into the [*Miller/Lyle/Roby*] factors that I discussed.

Also discussed the nature and circumstances of the offense that played into the Court's decision-making. The Defendant has no criminal history so that played a part in determining the [*Miller/Lyle/Roby*] factors, but no criminal history means that that did not aggravate at all the Court's determination in this case. I considered the recommendation of both counsel. I, obviously, considered all of the evidence that was presented here today. I considered the statement of the Defendant.

I find that the sentence imposed offers the Defendant the maximum opportunity for rehabilitation balanced against the interest in protecting the community and, again, all of the other items that I recited in my analysis of the [*Miller/Lyle/Roby*] factors.

Thus, the district court provided adequate reasons for the sentence it imposed.

## IV. Conclusion.

For all of the reasons given above, we affirm the sentence imposed.

**AFFIRMED.**