# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Terriel Leshawn Mack, Appellant.

Appellate Case No. 2019-000521

Appeal from Florence County
William H. Seals, Jr., Circuit Court Judge

Opinion No. 6031
Heard March 16, 2022 – Filed July 12, 2023
Withdrawn, Substituted and Refiled November 1, 2023

## REVERSED AND REMANDED

Kathrine Haggard Hudgins, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, Senior Assistant Attorney General W. Edgar Salter, III, all of Columbia, and Solicitor Edgar Lewis Clements, III, of Florence, for Respondent.

**GEATHERS, J.:** Terriel Leshawn Mack appeals the result of a resentencing hearing required by our supreme court's decision in *Aiken v. Byars*, 410 S.C. 534, 765 S.E.2d 572 (2014). Mack argues that the circuit court (1) erred by sentencing Mack to life without parole without finding that he was irreparably corrupt; (2) did not properly consider the "hallmark features of youth" in its decision; (3) improperly

rejected Mack's argument that he could be rehabilitated because of his relative youth at the time of the crime; (4) faulted Mack for not overcoming the circumstances of his upbringing; and (5) erred in finding that Mack's youth did not hinder his ability to present a defense in his original trial. We reverse and remand for reconsideration under the standards laid out by our supreme court.

## FACTS/PROCEDURAL HISTORY

In 2003, Terriel Lashawn Mack and two co-defendants, Islam Horn and Gregory Johnson, were indicted for the murder of Joseph Todd Wilson (the victim) and for conspiracy. Mack was seventeen years old at the time of the victim's death.

At trial, Horn and Johnson testified that on the day of the victim's death, they drove to North Florence with Mack. At some point, Mack saw the victim and "wanted to holler at" him. Mack and Johnson got out of the car. Not long after, Horn "heard the first gunshot." Moving his car slightly, Horn saw Mack "stand over [the victim] and shoot him three more times in the back."

According to Johnson, when Mack first saw the victim, "he ask[ed] me was that [the victim] who snitched on somebody else[,] a guy by the name of White Boy[.]"[1] Johnson testified that he and Mack exited the car, and, a few moments later, Mack shot the victim in the head. Johnson said he was running away by the time Mack fired the last three bullets.

At trial, Horn also read and helped decode an incriminating letter he said Mack wrote to Horn while the two of them were in jail following the crime. The contents included:

> I got out the car me and [Johnson] and I call [the victim] like, Yo, that my n** Tellie. Then he started walking back towards me. [Johnson] was like, Yo, the jakes is over there.[2] I was like f*** that n**. I ain't got no time to waste. Plus, I don't give a f*** about no jakes anyway. Son, I had hollows in the chamber and I blew that b**** n** brains out . . . . That n** s*** splattered everywhere

---

[1] Investigator Ron Smith testified about a previous violent crime in Florence. According to Investigator Smith, two men were shot: Antonio McCall, who died, and the victim. Shortly after the incident, the victim blamed the shooting on "White Boy."

[2] According to Horn, "jakes" is a term for law enforcement.

and he drop like a rag doll, like he had spaghetti legs or some s***, put three in his back.

The letter also suggested that Mack killed the victim "for WB and my n** BG rest in peace . . . ." Mack also allegedly wrote: "I told myself the only thing I was coming back to jail for was either bricks or bodies and I stuck to my word."[3] During a hearing on his post-conviction relief application, Mack denied being the author of the letter.

The jury found Mack guilty of murder. The court sentenced Mack to life in prison without parole (LWOP). This court affirmed in an *Anders* appeal.

In 2014, Mack and fourteen other individuals challenged the legality of their LWOP sentences in *Aiken v. Byars*, 410 S.C. 534, 765 S.E.2d 572 (2014). A divided South Carolina Supreme Court found that they were entitled to new sentencing hearings under either the U.S. Supreme Court's recent interpretations of the Eighth Amendment to the U.S. Constitution or under a similar provision of the South Carolina Constitution.[4] *Id.* at 545–46, 765 S.E.2d at 578. The plurality held that circuit courts must consider the following factors (*Aiken* factors) when sentencing a juvenile to LWOP:

> (1) the chronological age of the offender and the hallmark features of youth, including "immaturity, impetuosity, and failure to appreciate [] risks and consequence[s]"; (2) the "family and home environment" that surrounded the offender; (3) the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and how familial and peer pressures may have affected him; (4) the "incompetencies associated with youth—for example, [the offender's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the offender's] incapacity to assist his own attorneys"; and (5) the "possibility of rehabilitation."

---

[3] We are unable to locate an actual copy of the note in the record. What is reproduced is based on testimony at Mack's trial.

[4] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII; *see also* S.C. Const. art. I, § 15 ("Excessive bail shall not be required, nor shall excessive fines be imposed, nor shall cruel, nor corporal, nor unusual punishment be inflicted, nor shall witnesses be unreasonably detained.").

*Id.* at 544, 765 S.E.2d at 577 (first and second alterations added) (quoting *Miller v. Alabama*, 567 U.S. 460, 477–78 (2012)).[5]  Following our supreme court's decision, Mack filed a motion for resentencing that was granted.

At Mack's resentencing hearing, the State attempted to portray Mack as a remorseless killer.  Mack presented an array of evidence about aspects of his first trial, the offense, and his life both before and after the murder.

Testifying for the State, Detective Melvin Godwin said Mack had confessed to the murder in a statement to police and that Mack said he murdered the victim to prevent him from testifying against "White Boy," whose real name was Marcus Martin.[6]  However, under cross-examination, Godwin was forced to concede that Mack had asked for a lawyer, but law enforcement had continued questioning him anyway.

The State also introduced Mack's disciplinary record in prison, which included charges and allegations of weapons and drug possession, fights with guards, threats to guards, property damage, being part of a "security threat group," and eight instances of public masturbation.  He once allegedly attempted to bribe a prison guard to bring money into the prison for him.  In all, Mack had twenty-seven reports over more than twelve years.  Mack was also investigated for homicide in an investigation related to a riot at Lee Correctional Institute.  At his resentencing hearing, Mack said that "some [of the incidents were] entirely my fault"; additional incidents were caused by "misunderstandings"; and other disciplinary actions included times he was "falsely accused and unable to prove my innocence."

Mack presented the testimony of Dr. Geoffrey McKee, a forensic psychologist.  Dr. McKee testified about Mack's complicated relationship with the father figures in his life.  Mack's biological father denied paternity even after testing confirmed he was Mack's father.  A romantic partner of his mother, a man named Nathaniel, acted as a "father figure" to Mack and was abusive to his mother.  A subsequent romantic partner of his mother insisted on removing any trace of

---

[5] Justice Pleicones concurred in the result that the petitioners were entitled to "seek resentencing in a proceeding that complies with the standards announced" in *Miller* but noted the result was under the South Carolina Constitution, not the U.S. Constitution.  *Id.* at 545–46, 765 S.E.2d at 578.

[6] Mack's statement does not appear to have been admitted into evidence at Mack's murder trial.

Nathaniel, forcing Mack to deny the existence of the man he viewed as a "father figure" and "role model."

Dr. McKee also testified about the abuse Mack experienced and witnessed. Mack once defended his mother from an abuser. Mack was also abused by his mother on at least one occasion. At the age of twelve, Mack was sexually assaulted by a seventeen-year-old female.[7] Around the same time, Mack began using alcohol and marijuana. Dr. McKee testified that he believed Mack could be rehabilitated.

After the end of testimony and evidence, Mack addressed the court.

> I would like to sincerely apologize for my involvement in the death of Mr. Wilson . . . . At the time of my arrest, I was a 17-year-old child that was under the false impression that I was a grown man because at least since the age of 13[,] I have been running around town with people I thought were my friends doing what we thought grownups did[:] alcohol, doing drugs[,] and living every day like life was a game people press restart—press a restart button on.

Mack also discussed his involvement in the prison ministry and his efforts to tutor fellow inmates.

Both sides also introduced dozens of pages of documentary evidence. A Department of Juvenile Justice report prepared when Mack was fifteen and had been charged with petit larceny stated that he was "cool and indifferent to the feelings and welfare of others." The report also said Mack "does not appear interested in developing close relationships with others, and [his] ties to others are generally based on sharing similar antisocial or unempathetic attitudes." The report indicated that Mack had been charged with multiple counts of damaging or tampering with a vehicle and larceny in a December 2001 incident. There were also assorted assault charges listed.[8]

The defense introduced a psychiatric evaluation by Dr. Matthew Gaskins noting an incident in which Mack told a nurse practitioner that "'he was found

---

[7] The seventeen-year-old was a "former babysitter" of Mack's.

[8] At Mack's murder trial, counsel for the State and the court referred to three counts of assault and battery with intent to kill that were "pending." It is not clear what became of those charges.

hanging in the shower' and had to be cut down." Dr. Gaskins also noted Mack had an array of diagnoses—including posttraumatic stress disorder, psychosis, antisocial personality disorder, and malingering—and prescriptions for Mack. Gaskins's report also noted Mack said he once kept a sharpened stick at prison because "he had shoulder surgery and 'was a one-armed man' making him feel 'like a sitting duck.'" Gaskins added: "His experiences have led him to knowingly push boundaries and break rules in order to 'survive' while incarcerated (i.e.[,] have a potential weapon when limited physically, fight an officer/inmate who disrespects him publicly)." Gaskins also wrote: "the most common form of malingering is exaggeration and should not be dismissed." As to the personality disorder diagnosis, Gaskins emphasized Mack's incarceration and prior experience. "[T]hese traits seem to have been adaptively beneficial for Mr. Mack to survive 'street life' and while in prison. It is not clear that he would continue this pattern of behavior as an adult in a non-correctional setting."

The resentencing court sentenced Mack to LWOP again. The court stated that it was "extremely concerned by the cold-blooded nature of the killing[] and the fact that [Mack] has shown little to no signs of rehabilitation." The court also said that it had "carefully and deliberately considered all the factors as outlined in *Aiken v. Byars*" before reaching its decision.

This appeal followed. This court issued an unpublished opinion affirming Mack's sentence on February 23, 2023. Mack subsequently filed a petition for rehearing. Following a review of the petition and the issues raised, we reverse and remand.

## ISSUES ON APPEAL

I.  Did the circuit court err by sentencing Mack to LWOP without a specific finding that he was irreparably corrupt?

II. Did the circuit court inadequately consider the "hallmark features of youth" in its decision to sentence Mack to LWOP?

III. Did the circuit court err in failing to adequately consider the impact of Mack's upbringing?

IV. Did the circuit court err in rejecting Mack's argument that he could be rehabilitated because of his relative youth at the time of the crime?

V.	Did the circuit court err in finding that Mack's youth did not hinder his ability to present a defense in his original trial?

## STANDARD OF REVIEW

Mack argues that the standard of review in this case is a novel issue in our state because it concerns juvenile LWOP sentencing. This framing distorts the issue; South Carolina courts have frequently dealt with sentencing decisions in the context of the Eighth Amendment, which is the proper background for reviewing Mack's claim.

> When considering whether a sentence violates the Eighth Amendment's prohibition on cruel and unusual punishments, the appellate court's standard of review extends *only to the correction of errors of law.* Therefore, this court will not disturb the circuit court's findings absent a manifest abuse of discretion. An abuse of discretion occurs when the circuit court's finding is based on an error of law or grounded in factual conclusions without evidentiary support.

*State v. Finley*, 427 S.C. 419, 423, 831 S.E.2d 158, 160 (Ct. App. 2019) (emphasis added) (citations omitted).

## LAW/ANALYSIS

We will begin our discussion of Mack's case by addressing the state of the law, then turn to which of Mack's issues on appeal survive the most recent U.S. Supreme Court decision, and then analyze the issues that remain.[9]

## I.	STATUS OF LAW ON JUVENILES AND LWOP

In 2012, the United States Supreme Court issued a landmark decision in *Miller v. Alabama*, 567 U.S. 460 (2012). There, the Court held "that mandatory life without

---

[9] The State argues that Mack failed to preserve some arguments based on particular cases because he did not cite those cases to the resentencing court. Suffice it to say that we believe it would come as a shock to our state's appellate bar if we were to find that each and every example of case law—or even a line of cases—used to support an argument on appeal and clearly relevant to the issues argued before the resentencing court must be recited at that level if a party wished to rely on those cases on appeal.

parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Id.* at 465 (quoting U.S. Const. amend. VIII). The Court explained this conclusion rested on the nature of human development and the recognition in constitutional law that "children are different." *Id.* at 479–81.

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

*Id.* at 477–78.

The South Carolina Supreme Court considered the impact of *Miller* on South Carolina law in *Aiken v. Byars*. There, a plurality of the court found *Miller* affected South Carolina's discretionary sentencing regime because "*Miller* does more than ban mandatory life sentencing schemes for juveniles; it establishes an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered." 410 S.C. 534, 543, 765 S.E.2d 572, 576–77 (2014). The plurality laid out the *Aiken* factors to guide courts in carrying out their duties under the Eighth Amendment.[10] *Id.* at 544, 765 S.E.2d at 577.

After *Aiken*, the U.S. Supreme Court elaborated further on the dimensions of *Miller* in *Montgomery v. Louisiana*:

---

[10] Despite holding "*Miller* does not require that we grant relief to juveniles who received discretionary life without the possibility of parole (LWOP) sentences," Justice Pleicones concurred, saying he "would reach the same result under S.C. Const. art. I, § 15." *Id.* at 545–46, 765 S.E.2d at 578.

> *Miller*, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "unfortunate yet transient immaturity."

577 U.S. 190, 208 (2016) (citation omitted) (quoting *Miller*, 567 U.S. at 472, 479). The Court added: "A hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." *Id.* at 210 (quoting *Miller*, 567 U.S. at 465).

In 2021, the U.S. Supreme Court again addressed the issue in an effort to clarify the meaning of *Miller* and *Montgomery*. In *Jones v. Mississippi*, the Court held: "*Miller* did not require the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence." 141 S.Ct. 1307, 1316 (2021). Instead, the majority found that "[t]he Court's precedents require a discretionary sentencing procedure in a case of this kind." *Id.* at 1322.

The *Jones* opinion was issued well after Mack and the State submitted their briefs in this case, but it affects our considerations here. The first question we confront is whether Mack's issues survive.

## II.    SURVIVAL OF MACK'S ISSUES

As an initial matter, Mack's first issue on appeal—whether the circuit court should have made a finding that Mack was irreparably corrupt—is without merit in light of recent U.S. Supreme Court and South Carolina decisions, most significantly the *Jones* opinion. "[T]he Court has already ruled that a separate factual finding of permanent incorrigibility is not required . . . . In a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Jones*, 141 S.Ct. at 1313 (footnote omitted).

South Carolina courts have followed suit in finding that there is no need for a circuit court to rule that a juvenile is "permanently incorrigible" before sentencing that juvenile to LWOP. *See State v. Miller*, 433 S.C. 613, 627, 861 S.E.2d 373, 380

(Ct. App. 2021) ("As to [the appellant's] argument that a trial court must specifically find a juvenile is 'irreparably corrupt' before sentencing him or her to a life sentence, pursuant to *Jones v. Mississippi*, such a finding is not required under the Eighth Amendment."), *cert. granted* (Oct. 7, 2022); *see also State v. Slocumb*, 426 S.C. 297, 299, 827 S.E.2d 148, 149 (2019) ("Once the Supreme Court has drawn a line in the sand, the authority to redraw that line and broaden federal constitutional protections is limited to our nation's highest court."); *State v. Finley*, 427 S.C. 419, 427, 831 S.E.2d 158, 162 (Ct. App. 2019) (noting that the *Slocumb* court "declined to extend the holdings of *Graham* and *Miller*, stating 'a long line of Supreme Court precedent prohibits us from extending federal constitutional protections beyond the boundaries the Supreme Court itself has set'" (quoting *Slocumb*, 426 S.C. at 306, 827 S.E.2d at 153)).

Even so, we find that Mack's issues related to the *Aiken* factors must still be resolved. The U.S. Supreme Court's precedents through *Montgomery* require that a court "have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Miller*, 567 U.S. at 489; *see also Montgomery*, 577 U.S. at 208 ("*Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" (quoting *Miller*, 567 U.S. at 480)). The plain language of *Jones* provides that the decision is not intended to remove state-level safeguards for juvenile sentencing. *See Jones*, 141 S.Ct. at 1323 ("[O]ur holding today does not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder."). The court noted that *Miller* and *Montgomery* declined to mandate how the states complied with their Eighth Amendment obligations in juvenile sentencing—as long as they did so. *See Jones*, 141 S.Ct. at 1314 ("*Miller* mandated 'only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." (quoting *Miller*, 567 U.S. at 483)); *see also Malvo v. State*, 281 A.3d 758, 765 (Md. 2022) (holding that "the Court's opinion in *Jones* focused almost exclusively on Miller's procedural component," but that "*Miller*'s substantive holding, as articulated in *Montgomery*, remains good law").

Our supreme court has decided that, in South Carolina, compliance should take the shape of a review of the *Aiken* factors. The holdings in our supreme court's most recent cases have reaffirmed that decision. *See State v. Smart*, 439 S.C. 641, 889 S.E.2d 573 (2023); *Jones v. State*, 440 S.C. 14, 889 S.E.2d 590 (2023).

In sum, we may not consider Mack's contention that his resentencing court was required to find him "irreparably corrupt." However, we will review the

resentencing court's process in considering the *Aiken* factors. As we explain, this is where the resentencing court missed the mark.

## III. *AIKEN* FACTORS

There are, essentially, four ways in which Mack argues that the resentencing court misinterpreted *Miller* and *Aiken*. We will address two that we find particularly troubling and will not address the other two because they are not essential to our holding. Our conclusion, though, is that we agree with Mack.

First, Mack argues that the resentencing court did not adequately consider whether his crimes were affected by "the chronological age of the offender and the hallmark features of youth, including 'immaturity, impetuosity, and failure to appreciate [] risks and consequence[s.]'" *Aiken*, 410 S.C. at 544, 765 S.E.2d at 577 (quoting *Miller*, 567 U.S. at 477). We agree.

The resentencing court's order addresses Mack's age only as a chronological fact and does not seem to consider the "hallmark features of youth" at all. It found that:

> In regards to the age of the offender, [Mack] was 17 years old at the time of the murder, and was 18 years old when he was convicted. The court considered that at the time of the murder, [Mack] was within one year of being able to serve in the military to possibly fight and die for this country and had a driver's license. [Mack] was within one year of an age whereby he would have immense responsibilities and be considered an adult by law.

While all of this is true, it could also be said about any seventeen-year-old facing a potential LWOP sentence. *Miller* requires more; it requires "factors of youth [be] carefully and thoughtfully considered" in the individualized sentencing proceeding. *Aiken*, 410 S.C. at 543, 765 S.E.2d at 577 (noting that in some of the sentencing hearings at issue, "[m]any of the attorneys mention[ed] age as nothing more than a chronological fact in a vague plea for mercy. *Miller* holds the Constitution requires more.").

We acknowledge that the fact that an offender is seventeen rather than a younger age is relevant to the inquiry. *See Miller*, 567 U.S. at 476–77 (criticizing mandatory LWOP because "every juvenile will receive the same sentence as every other—the 17–year–old and the 14–year–old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one"); *see*

*also Malvo*, 281 A.3d at 816 (Hotten, J., dissenting) ("In determining whether Petitioner's crimes were representative of 'transient immaturity,' it is relevant that Petitioner was nearly an adult."). But, it does not remove a juvenile from the protection of *Miller* and *Aiken*. Under *Aiken*, *Miller*, and the entire line of authority about juvenile sentencing, the courts have made clear that seventeen-year-olds are not kind-of juveniles, or sort-of juveniles. They are juveniles. *Montgomery*, 577 U.S. at 212 ("The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change."); *Miller*, 567 U.S. at 474 ("[I]mposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children."); *see also Roper v. Simmons*, 543 U.S. 551, 574 (2005) ("The qualities that distinguish juveniles from adults *do not disappear when an individual turns 18*. By the same token, some under 18 have already attained a level of maturity some adults will never reach . . . . The age of 18 is the point where society draws the line for many purposes between *childhood* and adulthood." (emphases added)); *Aiken*, 410 S.C. at 537 n.1, 765 S.E.2d at 573 n.1 ("However, *Miller* extends to defendants under eighteen years of age and therefore for the purposes of this opinion[,] we consider juveniles to be individuals under eighteen."). As the Iowa Supreme Court held:

> [A]ge is not a sliding scale that necessarily weighs against mitigation the closer the offender is to turning eighteen years old at the time of the crime. When the *Miller* Court referred to "chronological age" in identifying the need to distinguish the criminal sentencing of children from adults, it did not suggest that a seventeen-year-old child is more deserving of adult punishment than a sixteen-year-old child, or a fifteen-year-old child more deserving than a fourteen-year-old child. It referred to "chronological age" as a unit of age that distinguishes children from adults. The Court recognized that children within this unit have "signature qualities" of "immaturity, irresponsibility, 'impetuousness[,] and recklessness.'" . . . This is not to say judges cannot and should not be alert to circumstances that might suggest the age of a particular offender might not support mitigation. Yet, categorical age groups do not exist for children to justify using age alone as a factor against granting eligibility for parole.

*State v. Roby*, 897 N.W.2d 127, 145–46 (Iowa 2017) (citations omitted) (first alteration added) (quoting *Miller*, 567 U.S. at 476).[11]

To be sure, our courts need not write peer-reviewed papers about human development to follow *Aiken*. *See J.D.B. v. North Carolina*, 564 U.S. 261, 279–80 (2011) ("In short, officers and judges need no imaginative powers, knowledge of developmental psychology, training in cognitive science, or expertise in social and cultural anthropology to account for a child's age. They simply need the common sense to know that a 7-year-old is not a 13-year-old and neither is an adult."). Our courts do, though, need to appreciate that "[a] child's age is far 'more than a chronological fact.'" *Id.* at 272 (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 115 (1982)); *see also id.* ("It is a fact that 'generates commonsense conclusions about behavior and perception.'" (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 674 (2004) (Breyer, J., dissenting))).

Simply finding that Mack was almost eighteen—as emphasized by the resentencing court—does not account for the careful and thoughtful consideration the U.S. Supreme Court considers vital. Nor does it change the fact that Mack was not yet eighteen when the crime occurred. The resentencing court's order only considered Mack's age a chronological fact; *Miller* requires more. *See Aiken*, 410 S.C. at 543, 765 S.E.2d at 577 (noting that in some of the sentencing hearings at issue, "[m]any of the attorneys mention[ed] age as nothing more than a chronological fact in a vague plea for mercy. *Miller* holds the Constitution requires more."). Further, other than stating it had considered all the *Aiken* factors, the resentencing court order makes no reference to "the hallmark features of youth, including 'immaturity, impetuosity, and failure to appreciate [] risks and consequence[s.]'" *Aiken*, 410 S.C. at 544, 765 S.E.2d at 577 (quoting *Miller*, 567 U.S. at 477). As a result, the court erred by failing to adequately consider whether Mack's crimes were affected by his chronological age and the hallmark features of youth.

Second, Mack argues that the resentencing court erred in its interpretation of the *Aiken* factor concerning a defendant's home life. Again, we agree.

The second *Aiken* factor requires "the 'family and home environment' that surrounded the offender" be accounted for in a court's decision on whether to sentence a juvenile to LWOP. *Aiken*, 410 S.C. at 544, 765 S.E.2d at 577.

---

[11] *Roby* dealt with a non-homicide crime. 897 N.W.2d at 132. However, it references *Miller* and similar precedent and draws on Iowa's version of the *Aiken* factors.

We are unable to locate any South Carolina authority elaborating on what aspects of a juvenile's upbringing should carry weight in considering whether to impose a sentence of LWOP. However, we find the approach of the *Roby* court persuasive:

> This factor seeks to identify any familial dependency and negative influences of family circumstances that can be ingrained on children . . . . [E]xpert testimony will best assess how the family and home environment may have affected the functioning of the juvenile offender. This factor does not rely on general perceptions, but specific measures of the degree of functioning. Furthermore, it is not limited to extremely brutal or dysfunctional home environments, but considers the impact of all circumstances and all income and social backgrounds.

897 N.W.2d at 146 (citations omitted).

Here, we need not decide whether Mack's home life could arguably qualify as evidence of an "extremely brutal or dysfunctional home environment[]." We are concerned only with whether the resentencing court's order shows a meaningful consideration of the evidence about Mack's home life. We find that it does not. The resentencing court found:

> [Mack] grew up in a bad home environment, whereby he witnessed several traumatic events in his childhood[] and was affected by these events as well as many other things in his life. However, the court recognizes that many successful people grew up in chaotic and violent environments[] and were able to adhere to the law and become productive members of society. Additionally, the State highlighted the childhoods of Elie Wiesel, Oprah Winfrey, and Tyler Perry[] and how they all were able to overcome traumatic experiences in their childhoods and home life and become good, law-abiding[] citizens in the community.

The court misapprehended the nature of the question this *Aiken* factor seeks to answer. The inquiry does not ask the court to use the success of others in overcoming their circumstances as the yardstick when considering the defendant's circumstances. Certainly, there are untold numbers of individuals—both public and

private—who have been successful in overcoming abject poverty and a myriad of hardships and traumatic childhoods. And, others have failed. Nonetheless, this is not the appropriate rubric to be applied under the *Aiken* factors. The inquiry requires the court to consider the impact of *the defendant's* family and home environment *on his crimes*. It is a specific and individualized inquiry.

Even if we were to interpret the resentencing court's use of the examples of celebrities with harsh childhoods as rhetorical flourish, the resentencing court did not make findings as to how Mack's childhood affected *him*. The order did provide, "[Mack] grew up in a bad home environment"; however, this finding does not reflect the consideration required by *Aiken*. *See Aiken*, 410 S.C. at 545, 765 S.E.2d at 578 (holding a juvenile defendant facing a LWOP sentence must receive "an *individualized* hearing where the mitigating hallmark features of youth are fully explored" (emphasis added)). Applying the *Aiken* factors involves more than repeating the words; it requires applying the substantive content of those factors.

Finally, we note our supreme court issued two holdings in *Smart* and *Jones* during the time this case was in the appeals process. Our conclusion does not ignore or conflict with those holdings.

In *Smart*, our supreme court found that neither the State nor the defendant bore the burden in a resentencing hearing pursuant to *Aiken*. *Smart v. State*, 439 S.C. 641, 645, 889 S.E.2d 573, 575 (2023). While affirming the resentencing court in that case, our supreme court noted that "there is language in the resentencing court's oral ruling that could be understood to support [the defendant]'s claim that the court placed an improper burden on him." *Id.* at 646, 889 S.E.2d at 576. "After a careful review of the entire record, however, we are convinced the resentencing court thoroughly considered Smart's background and history in light of the *Aiken* factors." *Id.*

In *Jones*, the majority held juvenile offenders can constitutionally be subjected to mandatory minimum sentencing, but circuit courts must nonetheless consider the "mitigating factors of youth in sentencing juveniles" who are subject to the circuit court's jurisdiction because of the charges against them. 440 S.C. 14, 29, 889 S.E.2d 590, 598 (2023). The defendant in *Jones* was asked about (1) his age, (2) his criminal record, (3) his employment history, (4) medication he was on, and (5) his understanding of the consequences of pleading guilty. *Id.* at 30, 889 S.E.2d at 599. The majority found the plea colloquy satisfied the requirements of *Aiken* in that context. *Id.*

Unlike *Smart* and *Jones*, the resentencing court's order does not reflect a careful and thorough consideration of the *Aiken* factors.  To be sure, the resentencing court stated that although Mack "presented some mitigating evidence including his immaturity at the time of the murder, some mental health diagnoses, and growing up in a difficult environment, this [c]ourt believes these limited mitigating factors are substantially outweighed by the areas mentioned above pursuant to *Aiken v. Byars*." However, as discussed above, the resentencing court's order does not adequately consider the *Aiken* factors and "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Montgomery*, 577 U.S. at 208 (quoting *Miller*, 567 U.S. at 480).  Rather, Mack's age being near the age of majority was used against him without affording him full consideration of juvenility; and, he was faulted for not overcoming his circumstances.  *See Aiken*, 410 S.C. at 545, 765 S.E.2d at 578 ("*Miller* requires that before a life without parole sentence is imposed upon a juvenile offender, he must receive an individualized hearing where the *mitigating* hallmark features of youth are fully explored." (emphasis added)).

Because we reverse based on the inadequate consideration of the hallmark features of youth and Mack's upbringing, we do not need to address Mack's remaining challenges to the resentencing court's order.  We remand for the resentencing court to consider all of the *Aiken* factors.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating that the "appellate court need not address remaining issues when disposition of prior issue is dispositive" (citing *Whiteside v. Cherokee Cnty. Sch. Dist. No. One*, 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993))).

## CONCLUSION

We believe this is a rare instance in which issuing a new opinion on rehearing is appropriate.  An individual's rights under the Eighth Amendment of the U.S. Constitution and the similar safeguard under the South Carolina Constitution are implicated.  As Mack highlights in his petition for rehearing, we expressed concerns about the resentencing court's order in our initial opinion.  It is imperative for us to thoughtfully reconsider the issues rather than mechanically insist we were correct on a close question.  We hold that Mack is entitled to have the determination of his sentence made after a faithful application of the *Aiken* factors.

Based on the foregoing, the resentencing court's order is reversed, and the case is remanded for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

**HILL, A.J., AND LOCKEMY, A.J., concur.**