# IN THE COURT OF APPEALS OF IOWA

No. 22-1794
Filed July 3, 2024

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**QUARIAN DEONTE MOORE,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.


        A defendant appeals his convictions and sentences for first-degree murder

and attempted murder.  **AFFIRMED.**


        Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson and

Ashley Stewart (until withdrawal), Assistant Appellate Defenders, for appellant.

        Brenna Bird, Attorney General, and Timothy M. Hau, Assistant Attorney

General, for appellee.


        Heard by Bower, C.J., and Tabor and Greer, JJ., but decided by Tabor, P.J.,

Greer, J., and Bower, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**TABOR, Presiding Judge.**

A jury convicted Quarian Moore of first-degree murder and attempted murder for shooting two people at a Des Moines intersection in November 2021. Moore was just shy of his eighteenth birthday at the time of the crime. The district court imposed a mandatory minimum term of incarceration of twenty-five years. Moore now argues the State failed to present sufficient evidence that he was the shooter and that the court improperly applied the juvenile sentencing factors.[1] Finding substantial evidence that Moore shot and killed Dean Deng and wounded B.C., and observing no abuse of discretion in Moore's sentencing, we affirm.

## I. Facts and Prior Proceedings

Security footage of the drive-by shooting in the early morning hours of November 14—coupled with Moore's suspicious actions before and after—led police to probe his involvement. Three hours before the shooting, Moore was hanging out at his friend Ryan's apartment. Around midnight, Ryan recorded a Snapchat video that showed Moore wearing a distinctive sweatshirt and pointing a black and brown handgun[2] at the phone camera.

A few hours later, Moore left that apartment—carrying a black bag. He was seen on the building's camera at 3:49 a.m. getting into the passenger seat of a Toyota Sienna van driven by his girlfriend, R.P.-H. Just ten minutes before the shooting, the van left the parking lot on Hubbell Avenue.

---

[1] In his appellant's brief, Moore also asks our supreme court to reconsider its stance on mandatory minimums for juveniles under the Iowa Constitution. But the case was transferred to us. We must follow precedent. *See State v. Zarate*, 908 N.W.2d 831, 856 (Iowa 2018).

[2] Detectives never found that gun, but the State asserted that it was "consistent with the murder weapon."

From there, detectives pieced together evidence that Moore was the shooter. They used video surveillance from around the city, tracing his path from the apartment building with footage captured from businesses and private homes. That footage showed the van speeding by, at intervals, until it reached a redlight camera near East Fifteenth Street and Maple Street, a few blocks south of where the shooting happened. A camera at the nearby Subway restaurant showed two other vehicles—a silver Chrysler 200 and a silver Cadillac—come into frame at 3:59 a.m. Deng drove the Chrysler with three other occupants—B.C., in the front passenger seat, and G.B. and N.G. in the back seat.[3] Two other friends of Deng, S.A. and P.T., followed in the Cadillac. R.P.-H.'s van let the Chrysler and Cadillac pass so that it could follow behind them.

All three vehicles then stopped for a red light at the intersection of East Fourteenth Street and University Avenue. The van pulled into the turning lane to the left of the Chrysler, with the Cadillac slightly behind to the right. There is no video of the shooting. But at 4:00 a.m., a neighborhood doorbell camera recorded the sound of six shots being fired.

All three vehicles then took off west on University Avenue. The van sped away first. The Chrysler gave chase for about five blocks before slowing to a halt near Iowa Lutheran Hospital. The Cadillac did not make it that far, slamming into a curb near the shooting scene. A patrol officer happened to be driving west on University Avenue and saw the Cadillac hit the curb. Passenger P.T. bolted from

---

[3] Deng's mother said at the sentencing hearing that Deng was driving his friend's car home because his friend was too intoxicated to drive.

the Cadillac, stumbling a bit before running off. The patrol officer tried to talk to the driver, S.A., but he would not cooperate.

Meanwhile, from the Chrysler, backseat passenger G.B. called police. When officers arrived, they found the driver, Deng, unconscious; he "was slumped over so his head was towards the . . . front passenger side of [the] vehicle." The bullet went through his left arm into his chest. The officers tried in vain to resuscitate him. Medics transported Deng to the hospital, where he was pronounced dead. Front-seat passenger B.C. had also been shot. Police later learned that B.C. ran to the Lutheran Hospital emergency room where medical personnel treated an injury to his left forearm.

A hunt for the shooter ensued. Two and a half hours after the shooting, crime scene investigators found six round casings on the ground at East Fourteenth Street and University Avenue; the casings formed an arc between the left-turn lane and the center lane on the northbound side of the intersection. Ballistics analysts determined they were all discharged by the same gun. Investigators also noted "multiple . . . bullet holes on the driver side and front of the [Chrysler]." But they found no bullets inside either the Chrysler or the Cadillac. As for the third vehicle, around 9:00 a.m., police received a call from R.P.-H.'s mother reporting the Toyota van, registered to her daughter, had been stolen. R.P.-H. told her mother that the van was stolen between 4:00 and 9:00 that morning.

Police eventually identified R.P.-H.'s boyfriend, Moore, as the person entering her van at the Hubbell apartment complex. Armed with that information, police obtained footage from the doorbell camera at the house where Moore lived with his mother. It showed R.P.-H. and Moore going inside about one hour after

the shooting, Moore having changed his clothes.  They left after only four minutes.  Moore carried the same black bag as before.

The next day, police located the Toyota van behind a dumpster in a parking lot across from R.P.-H.'s apartment building.  No round casings were found inside the van.  But police could see that the passenger seat was fully reclined, and the back windows could not open wide enough to accommodate a shooter.[4]  Believing that Moore, as the van's front-seat passenger, was the shooter, police sought to arrest him.  They found him at his friend Ryan's apartment.  When Moore spotted the police, he fled, throwing a loaded nine millimeter Ruger under a car in the parking lot.  He was soon apprehended by detectives.  The discarded handgun was not the murder weapon.  In fact, the murder weapon was never found.

The State charged Moore with first-degree murder, a class "A" felony in violation of Iowa Code section 707.2(1)(a) (2021) and attempted murder, a class "B" felony in violation of section 707.11.  While in jail awaiting trial, Moore called R.P.-H., coaxing her to say: "You don't remember, you don't know."  And: "Basically, what they know is what you know.  Like, you picked me up, you, like, we heard shots, and we pulled off."

Although police identified the occupants of all three vehicles involved in the fatal encounter, none would cooperate with the investigation.  So, at trial, the State relied on circumstantial evidence to support its theory that Moore was the shooter.

---

[4] Des Moines Police detective Ryan Garrett testified that "the back window of the van is not a window that will roll down."  And in its closing argument, the State emphasized, "the back passenger windows don't open.  This is one of those ones where it kind of pops open like an inch and pops closed an inch.  It's not one that you would be able to roll down and shoot out the window."  At oral argument, Moore's counsel confirmed that description.

First, he and R.P.-H. were the van's only occupants and there was not enough time between leaving the apartment on Hubbell and reaching the intersection of East Fourteenth Street and University Avenue to pick up passengers. Detectives recreated Moore's route and determined that the drive took nine or ten minutes, roughly the same duration as the footage they obtained. Second, the van's back windows could not roll down to allow a backseat passenger to shoot out. Third, the occupants of the Cadillac were friends of Deng and B.C., so they were unlikely to have a motive to shoot at them. Fourth, the location of the round casings pointed to the van's passenger as the shooter.[5] Fifth, although police did not find the murder weapon, the casings found on the scene matched the ammunition loaded into the Ruger that Moore discarded while fleeing police.[6] And sixth, Detective Garrett testified he knew from his personal experience that Moore and "his associates" have "had disputes" with Deng and "his associates."

The jury found Moore guilty as charged. After hearing from experts for both the State and the defense on juvenile sentencing factors, the district court imposed a life sentence on the murder count, requiring Moore to serve twenty-five years before he was eligible for parole. On the attempted murder count, the court imposed a twenty-five-year term, requiring Moore to serve seventeen and one-half

---

[5] Detective Garrett testified that it would be unlikely for the casings to land on the street if the driver had shot them. He said while it is not an "exact science" to determine the shooter's location from the casings, "if a driver was driving a vehicle and shooting from the left side of the car outside of the right side of the car, those casings would more than likely be within the vehicle."

[6] Law enforcement was able to "narrow it down to just a couple different makes and models of gun that would have left these particular markings on [the] . . . casings."

years before being eligible for parole. The sentences are to run concurrently. Moore appeals both his convictions and sentences.

## II. Analysis

### A. Sufficiency of the Evidence

Moore first argues that the State did not present sufficient evidence that he was the shooter. He insists the circumstantial evidence against him is no stronger than the evidence pointing to others present at the shooting. He challenges the State's proof that he was in the van's passenger's seat. And even if he were there, he posits that the shooter could have been in the Cadillac.

We review Moore's claim for the correction of errors at law. *State v. Cook*, 996 N.W.2d 703, 708 (Iowa 2023). We consider "whether, taken in the light most favorable to the State, the finding of guilt is supported by substantial evidence in the record." *State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018) (citation omitted). Substantial evidence exists if the record "would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022) (citation omitted). "Evidence which merely raises suspicion, speculation, or conjecture is insufficient." *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992).

To convict Moore of first-degree murder, the State had to prove:

> 1) On or about November 14, 2021, [Moore] shot Dean Deng.
> 2) Dean Deng died as a result of being shot.
> 3) [Moore] acted with malice aforethought.
> 4) [Moore] acted willfully, deliberately, premeditatedly and with specific intent to kill Dean Deng or another.

And for attempted murder, the State had to prove:

> 1) On or about November 14, 2021, [Moore] shot B.C.
> 2) By his acts, [Moore] expected to set in motion a force or chain of events which could cause or result in the death of [B.C.]
> 3) When [Moore] acted, he specifically intended to cause the death of [B.C.] or another.

Moore challenges the State's proof of his identity. He emphasizes the lack of key evidence—no murder weapon, no eyewitnesses, no identifying information at the crime scene, no casings in the van, and "no video footage depicting the actual shooting." True, the State lacked direct proof of Moore's involvement. But it presented solid circumstantial evidence that Moore was the shooter. Through exhaustive police work, the State wove together Moore's ten-minute trip on surveillance cameras from the Hubbell apartment complex to the scene of the shooting. That video timeline allowed a reasonable jury to infer that Moore was the passenger in his girlfriend's van before, during, and after the shooting. Taken with the detective's testimony that the shooting was unlikely from the driver's side, the jury could reasonably determine that Moore was the shooter. The jury may rely on circumstantial evidence, "especially when those pieces of circumstantial evidence are considered collectively." *State v. Carter*, No. 17-1773, 2021 WL 1400758, at *9 (Iowa Ct. App. Apr. 14, 2021). "There is no categorical prohibition on stacking inferences so long as the evidence is" enough "to convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *Id.* (cleaned up) (citation omitted).

What's more, as the State argued on appeal, the prosecutors presented incriminating evidence of Moore's exploits before and after the shooting to "bookend" its case. On the front end was Ryan's Snapchat video showing Moore

brandishing a gun with his friends a few hours before the shooting. At the back end were Moore's phone calls to his girlfriend from jail. In one of those calls, Moore spoke about the Snapchat video and the gun evidence. He asked: "Did I tell you this already? The gun that—they have a video of me and Ryan?" R.P.-H. responded: "Yeah, they're trying to say that was the fucking gun." Moore then mentioned telling his lawyer that he "can go up to this person, get this information from this person, match it with that same gun in that video and see if—since I had that gun—they gonna be looking dumb as fuck." Moore also reminded R.P.-H. what happened, seeming to coach her on what to say. He mentioned the "brown and black gun" and how police thought "it could have been that." He then asked R.P.-H.: "would that be bad for me to say? That they think that that could have been the murder weapon? Dude got caught with it and it's not the gun. So, I don't have nothing to do with none of that."

At oral argument, Moore's counsel urged that this gun discussion had an innocent interpretation. That is, Moore knew he didn't have the murder weapon. Moore cites *State v. Truesdell* for the proposition that "[w]hen two reasonable inferences can be drawn from a piece of evidence . . . such evidence only gives rise to a suspicion and without additional evidence, is insufficient to support guilt." 679 N.W.2d 611, 618–19 (Iowa 2004). Granted that is the law. But here the State had a slew of circumstantial evidence beyond the jail calls. The calls just confirmed the State's theory of Moore's involvement. *See State v. Bentley*, 757 N.W.2d 257, 262 (Iowa 2008) ("[T]he prosecution does not have 'an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt.'" (citation omitted)). "[D]irect and circumstantial evidence are equally probative for the

'purposes of proving guilt beyond a reasonable doubt.'" *Id.* (citation omitted). The jury could reasonably conclude that the calls, coupled with the other incriminating evidence, pointed to Moore as the shooter.

On top of the jail calls, the State presented evidence that R.P.-H. and Moore tried to distance themselves from the shooting by claiming the van had been stolen in the early-morning hours of November 14. Moore also revealed his consciousness of guilt when he ran from police officers when they arrived at Ryan's apartment to arrest him. *See State v. Wilson*, 878 N.W.2d 203, 211 (Iowa 2016) ("It is well-settled law that the act of avoiding law enforcement after a crime has been committed may constitute circumstantial evidence of consciousness of guilt that is probative of guilt itself.").

In sum, the State presented substantial evidence that Moore was the shooter. The prosecutors did not rely on evidence that created mere speculation, suspicion, or conjuncture. Instead, they presented threads of evidence that, when woven together, could convince a jury of Moore's guilt beyond a reasonable doubt. Thus, we affirm Moore's convictions.

### B. Juvenile Sentencing Factors

Moore next contends that the district court misapplied the sentencing factors for youthful offenders. He maintains that the court abused its discretion by imposing a mandatory term of twenty-five years. We review Moore's sentencing challenge for an abuse of discretion. *State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017). We will find abuse of discretion only where "we are able to discern that the decision was exercised on grounds or for reasons that were clearly untenable or unreasonable." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002).

In applying this standard, we assess whether the district court weighed the societal goals of sentencing—rehabilitation and impact on the community. *See* Iowa Code § 901.5. Beyond those goals, sentencing courts must consider "the nature of the offense, the attending circumstances, the age, character and propensity of the offender, and the chances of reform." *Formaro*, 638 N.W.2d at 725.

But our review does not end there. Because Moore was a juvenile when he committed these crimes, the sentencing court had to give "complete and careful consideration of the relevant mitigating factors of youth." *Roby*, 897 N.W.2d at 144, 148. While the court may consider aggravating factors as well, they must not overwhelm these "mitigating factors associated with youth." *Zarate*, 908 N.W.2d at 850. Those factors include:

> (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences";
> (2) the particular "family and home environment" that surround the youth;
> (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime;
> (4) the challenges for youthful offenders in navigating through the criminal process; and
> (5) the possibility of rehabilitation and the capacity for change.

*State v. Lyle*, 854 N.W.2d 378, 404 n.10 (Iowa 2014) (quoting *Miller* v. *Alabama*, 567 U.S. 460, 477 (2012)).

Moore focuses on the first and fifth factors, contending the court discounted their mitigating potential. At the sentencing hearing, Moore called psychologist Dr. John Mayer to testify about his psychological evaluation. According to Dr. Mayer's report, Moore lacked maturity. The report mentioned that Moore's upbringing was good with no reports of physical abuse. But it noted that his father

was in prison and absent from his life. It emphasized that Moore was surrounded by anti-social role models. It also highlighted his history with the law. Dr. Mayer concluded that Moore was from an environment that rejects education and that he had low cognitive abilities, poor judgment, and was prone to make impulsive decisions. Dr. Mayer believed that Moore had a chance at rehabilitation with proper intervention. Any explicit mention of the *Miller/Lyle* factors was notably absent from his report.

The State countered with the testimony of psychologist Dr. Tracy Thomas. Her report differed from Dr. Mayer's views. She concentrated on the *Miller/Lyle* factors. Her report acknowledged Moore's below-average intelligence but found that his insight and judgment were fair—though colored by anti-social thinking. Her report also considered his upbringing, relationships, influences, and education. Dr. Thomas administered psychological tests, noting that Moore's results were consistent with his presentation at the interview.[7] Dr. Thomas found that Moore posed a risk for future violence and that he showed a high level of sophistication and maturity. Finally, her report found that his likelihood of meaningful engagement in treatment or benefiting from treatment was low.

After hearing the experts' competing opinions, the sentencing court found there were "some mitigating factors in regard to family home environment as it was made easier for Mr. Moore to engage in antisocial behavior." The court also noted Moore's lack of contact with his father was a mitigating circumstance under *Lyle*. The court acknowledged that Moore's "incapacity of youth . . . may have

---

[7] Moore mentioned to Dr. Mayer that he "didn't tell Tracy 'any truth,'" and that he was "in general population then and had to play the role like everyone else."

disadvantaged [him] in dealing with the justice system and challenges dealing with police, participation in court." But the court then said:

> Mr. Moore's juvenile age and immaturity is not such a mitigating factor as to cause the Court to mitigate any sentence for the defendant. The Court bases this on the evaluation done by Dr. Thomas and finds that more credible than Dr. Mayer's analysis evaluation. Dr. Thomas's evaluation is extremely thorough, scientific, and objective.

In concluding its sentencing explanation, the court stated:

> Finally, the fifth factor, Mr. Moore's potential for rehabilitation is, again, not a mitigating factor. The defendant has had opportunities before in regard to rehabilitation as shown by his prior record, including his juvenile record. It appears that the only way that the defendant can benefit from supervision and/or rehabilitation is to be done in an atmosphere that is controlled, structured, and effective. And, in order to protect the public, it's going to take time for Mr. Moore for any rehabilitation, and the Court finds that the sentence is, therefore, appropriate.

Ultimately, the court did not provide a reason why it went with the State's recommendation of a mandatory minimum term of twenty-five years.[8] Despite this gap, we find no abuse of discretion. While it would have been helpful for the court to walk us through its exact reasoning behind the mandatory minimum sentence, it did not err in accepting the State's recommendation. The court considered both experts' reports but found Dr. Thomas to be more credible. "Sentencing courts in Iowa generally have broad discretion to rely on information presented to them at

---

[8] The court has broad discretion to choose when a youthful offender is eligible for parole; "unlike the mandatory life without parole that adults who commit first-degree murder are subject to, there is no mandatory minimum term of confinement for juvenile offenders convicted of first-degree murder." *State v. Harrison*, 914 N.W.2d 178, 200 (Iowa 2018). A juvenile's mandatory minimum is defined by the court. *Zarate*, 908 N.W.2d at 845.

sentencing." *State v. Headley*, 926 N.W.2d 545, 550 (Iowa 2019).  The court acted within its discretion in giving greater weight to the stronger of the experts' reports.

The court also considered Moore's home environment as a mitigating factor because it made Moore more likely to engage in antisocial behavior.  But the court also noted that Moore "acted solely.  There was no evidence of peer pressure."  Indeed, Moore was a couple of months shy of his eighteenth birthday at the time of the crime, and Dr. Thomas believed that he could make his own decisions, which indicated maturity.  The court weighed the juvenile sentencing factors.  The court had room to balance the mitigating factors against the non-mitigating ones.  Thus, we find no abuse of discretion in its imposition of the mandatory minimum sentence in Moore's case.

**AFFIRMED.**